IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JANE DOE, individually and on
behalf of her minor daughter,
SUSAN DOE, et al.,

      Plaintiffs,

v.                                    Case No. 4:23-cv-00114-RH-MAF

JOSEPH A. LADAPO, in his
official capacity as Florida's
Surgeon General of the Florida
Department of Health, et al.,

      Defendants.
_____/

## <u>NOTICE OF APPEAL</u>

Defendants Surgeon General Ladapo, the Florida Board of Medicine, the Florida

Board of Osteopathic Medicine, the individual Board Members, and State Attorney

Gladson, appeal the order for preliminary injunction, Doc. 90, which was entered on

June 6, 2023, to the U.S. Court of Appeals for the Eleventh Circuit.

Dated: June 26, 2023                  Respectfully submitted by:

<u>/s/ James H. Percival</u>                  <u>/s/ Mohammad O. Jazil</u>
James H. Percival (FBN 1016188)       Mohammad O. Jazil (FBN 72556)
OFFICE OF THE ATTORNEY GENERAL        Gary V. Perko (FBN 855898)
The Capitol, Pl-01                    Michael Beato (FBN 1017715)
Tallahassee, Florida 32399-1050       Holtzman Vogel Baran
(850) 414-3300                        Torchinsky & Josefiak PLLC
(850) 410-2672 (fax)                  119 S. Monroe St., Suite 500
James.Percival@myfloridalegal.com     Tallahassee, FL 32301
                                      (850) 270-5938

| *Counsel for the Surgeon General, the Department of Health, and State Attorney Gladson* | mjazil@holtzmanvogel.com gperko@holtzmanvogel.com mbeato@holtzmanvogel.com |
| --- | --- |
| | *Counsel for the Surgeon General, the Department of Health, the Boards of Medicine, and the individual Board Members* |

## CERTIFICATE OF SERVICE

I certify that, on June 26, 2023, this answer was filed through the Court's

CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JANE DOE et al.,

      Plaintiffs,

v.                                    CASE NO. 4:23cv114-RH-MAF

JOSEPH A. LADAPO et al.,

      Defendants.

_____/


## PRELIMINARY INJUNCTION


      This action presents a constitutional challenge to a Florida statute and rules that (1) prohibit transgender minors from receiving specific kinds of widely accepted medical care and (2) prohibit doctors from providing it. The treatments at issue are GnRH agonists, colloquially known as "puberty blockers," and cross-sex hormones. This order grants a preliminary injunction.

### I. Background: the parties, record, and motions

      Each of the seven plaintiffs is the parent of a transgender child on whose behalf this action is brought. Three have moved for a temporary restraining order and preliminary injunction. One child's doctors say she needs GnRH agonists now, without delay; doctors for the other two say they will need GnRH agonists soon.

The needs of the other plaintiffs' children are less immediate, so they have not joined the emergency motions.

The defendants are the Florida Surgeon General, the Florida Board of Medicine and its members, the Florida Board of Osteopathic Medicine and its members, the Florida Attorney General, and each of Florida's 20 State Attorneys. The individuals are defendants only in their official capacities. This order refers to the Surgeon General, the Boards, and their members as the "medical defendants." The order refers to the Attorney General and State Attorneys as the "law-enforcement defendants."

The parties have stipulated to submission of the pending motions based on the written filings in this case and the record compiled in a separate case in this court with overlapping issues, *Dekker v. Weida*, No. 4:22cv325-RH-MAF.[1] A complete bench trial has been conducted in that case.

The plaintiffs and the medical defendants have fully briefed the issues in this case and have presented oral argument. The law-enforcement defendants have chosen to rely on the medical defendants and not to present their own briefs or oral argument. The Attorney General has moved to dismiss on procedural grounds applicable only to her; that motion will be addressed in a separate order.

---

[1] *See* Trial Tr. in *Dekker v. Weida*, No. 4:22cv325, ECF No. 239 at 174–75. Citations including "*Dekker*" refer to the docket in that case.

The motion for a preliminary injunction is ripe for a decision. This moots any need for separate consideration of a temporary restraining order.

## II.  Preliminary-injunction standards

As a prerequisite to a preliminary injunction, a plaintiff must establish a substantial likelihood of success on the merits, that the plaintiff will suffer irreparable injury if the injunction does not issue, that the threatened injury outweighs whatever damage the proposed injunction may cause a defendant, and that the injunction will not be adverse to the public interest. *See*, *e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

## III.  Gender identity is real

With extraordinarily rare exceptions not at issue here, every person is born with external sex characteristics, male or female, and chromosomes that match. As the person goes through life, the person also has a gender identity—a deeply felt internal sense of being male or female.[2] For more than 99% of people, the external sex characteristics and chromosomes—the determinants of what this order calls the person's natal sex—match the person's gender identity.[3]

---

[2] Trial Tr. in *Dekker*, ECF No. 226 at 23–24; Trial Tr. in *Dekker*, ECF No. 238 at 72–73.
[3] Trial Tr. in *Dekker*, ECF No. 227 at 222.

For less than 1%, the natal sex and gender identity are opposites: a natal male's gender identity is female, or vice versa.[4] This order refers to such a person who identifies as female as a transgender female and to such a person who identifies as male as a transgender male. This order refers to individuals whose gender identity matches their natal sex as cisgender.

The elephant in the room should be noted at the outset. Gender identity is real. The record makes this clear. The medical defendants, speaking through their attorneys, have admitted it. At least one defense expert also has admitted it.[5] That expert is Dr. Stephen B. Levine, the only defense expert who has actually treated a significant number of transgender patients. He addressed the issues conscientiously, on the merits, rather than as a biased advocate.

Despite the defense admissions, there are those who believe that cisgender individuals properly adhere to their natal sex and that transgender individuals have inappropriately *chosen* a contrary gender identity, male or female, just as one might choose whether to read Shakespeare or Grisham. Many people with this view tend to disapprove all things transgender and so oppose medical care that supports a person's transgender existence.[6] In this litigation, the medical

---

[4] *Id.*; *see also* Trial Tr. in *Dekker*, ECF No. 226 at 23–24; Trial Tr. in *Dekker*, ECF No. 228 at 29–31.

[5] *See* Trial Tr. in *Dekker*, ECF No. 239 at 10–11, 31–32, 80–81.

[6] *See* Trial Tr. in *Dekker*, ECF No. 239 at 129–31.

defendants have explicitly acknowledged that this view is wrong and that pushing

individuals away from their transgender identity is not a legitimate state interest.

Still, an unspoken suggestion running just below the surface in some of the

proceedings that led to adoption of the statute and rules at issue—and just below

the surface in the testimony of some of the defense experts—is that transgender

identity is not real, that it is made up.[7] And so, for example, one of the defendants'

experts, Dr. Paul Hruz, joined an amicus brief in another proceeding asserting

transgender individuals have only a "false belief" in their gender identity—that

they are maintaining a "charade" or "delusion."[8] Another defense expert, Dr.

Patrick Lappert—a surgeon who has never performed gender-affirming surgery—

said in a radio interview that gender-affirming care is a "lie," a "moral violation," a

"huge evil," and "diabolical."[9] State employees or consultants suggested treatment

of transgender individuals is either a "woke idea" or profiteering by the

pharmaceutical industry or doctors.[10]

---

[7] *See, e.g.*, Pls.' Exs. 284 & 285 in *Dekker*, ECF Nos. 182-21 & 182-22; *see also* Pls.' Ex. 304 in *Dekker*, ECF No. 183-6.

[8] Trial Tr. in *Dekker*, ECF No. 238 at 194–95. Dr. Hruz fended and parried questions and generally testified as a deeply biased advocate, not as an expert sharing relevant evidence-based information and opinions. I do not credit his testimony. I credit other defense experts only to the extent consistent with this opinion.

[9] Trial Tr. in *Dekker*, ECF No. 239 at 129–31.

[10] Pls.' Ex. 304 in *Dekker*, ECF No. 183-6; Pls.' Exs. 284 & 285 in *Dekker*, ECF Nos. 182-21 & 182-22.

Any proponent of the challenged statute and rules should put up or shut up: do you acknowledge that there are individuals with actual gender identities opposite their natal sex, or do you not? Dog whistles ought not be tolerated.

## IV.  The challenged statute and rules

The challenged parts of the statute and rules apply to patients under age 18.

The statute prohibits the use of "puberty blockers" to "stop or delay normal puberty in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex." Fla. Stat. § 456.001(9)(a)1.; *see id*. § 456.52. And the statute prohibits the use of "hormones or hormone antagonists to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex." *Id*. § 456.001(9)(a)2. The statute makes violation of these provisions a crime and grounds for terminating a healthcare practitioner's license. *See id.* § 456.52(1) & (5).

The statute has exceptions, including, for example, for use of these products during a transition away from them, but the exceptions are not relevant here. And the statute has other provisions, including a prohibition on transgender surgeries, but those provisions, too, are not at issue here.

The challenged rules were adopted by the Florida Board of Medicine and the Florida Board of Osteopathic Medicine. In identical language, the rules prohibit the Boards' licensed practitioners from treating "gender dysphoria in minors" with

"[p]uberty blocking, hormone, or hormone antagonist therapies." Fla. Admin.

Code r. 64B8-9.019(1)(b); Fla. Admin Code r. 64B15-14.014(1)(b).

## V. The standards of care

Transgender individuals suffer higher rates of anxiety, depression, suicidal ideation, and suicide than the population at large.[11] Some suffer gender dysphoria, a mental-health condition recognized in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). The diagnosis applies when specific criteria are met. Among other things, there must be a marked incongruence between one's experienced gender identity and natal sex for at least six months, manifested in specified ways, and clinically significant distress or impairment.[12]

There are well-established standards of care for treatment of gender dysphoria. These are set out in two publications: first, the Endocrine Society Clinical Practice Guidelines for the Treatment of Gender Dysphoria; and second, the World Professional Association for Transgender Health ("WPATH") Standards of Care, version 8.[13] I credit the abundant testimony in this record that these standards are widely followed by well-trained clinicians.[14] The standards are used

---

[11] Trial Tr. in *Dekker*, ECF No. 226 at 108.

[12] Pls.' Ex. 33 in *Dekker*, ECF No. 175-33 at 2–3; *see also* Trial Tr. in *Dekker*, ECF No. 226 at 25–26; Trial Tr. in *Dekker*, ECF No. 238 at 71.

[13] Defs.' Exs. 16 & 24 in *Dekker*, ECF Nos. 193-16 & 193-24.

[14] Trial Tr. in *Dekker*, ECF No. 226 at 31 (psychiatrist); *id.* at 198 (pediatric endocrinologist); Trial Tr. in *Dekker*, ECF No. 227 at 50–52 (surgeon); *id.* at 106,

by insurers[15] and have been endorsed by the United States Department of Health
and Human Services.[16]

    Under the standards, gender-dysphoria treatment begins with a
comprehensive biopsychosocial assessment.[17] In addition to any appropriate
mental-health therapy, there are three types of possible medical intervention, all
available only to adolescents or adults, never younger children.[18]

    First, for patients at or near the onset of puberty, medications known as
GnRH agonists can delay the onset or continuation of puberty and thus can reduce
the development of secondary sex characteristics inconsistent with the patient's
gender identity—breasts for transgender males, whiskers for transgender females,
changes in body shape, and other physical effects.[19]

    Second, cross-sex hormones—testosterone for transgender males, estrogen
for transgender females—can promote the development and maintenance of
characteristics consistent with the patient's gender identity and can limit the
development and maintenance of characteristics consistent with the patient's natal

---

112–14 (pediatrician, bioethicist, medical researcher); Trial Tr. in *Dekker*, ECF
No. 228 at 15 (physician specializing in pediatrics and adolescent medicine).
[15] Trial Tr. in *Dekker*, ECF No. 227 at 243–44.
[16] *See* Defs.' Ex. 2 in *Dekker*, ECF No. 193-2.
[17] *See* Trial Tr. in *Dekker*, ECF No. 226 at 42–43.
[18] Trial Tr. in *Dekker*, ECF No. 238 at 72 & 74–75; *see also* Trial Tr. in *Dekker*,
ECF No. 228 at 14; Trial Tr. in *Dekker*, ECF No. 226 at 36 & 176.
[19] *See* Trial Tr. in *Dekker*, ECF No. 226 at 194–97; Trial Tr. in *Dekker*, ECF No.
228 at 27–28.

sex.[20] For patients treated with GnRH agonists, use of cross-sex hormones typically begins when use of GnRH agonists ends.[21] Cross-sex hormones also can be used later in life, regardless of whether a patient was treated with GnRH agonists.

Third, for some patients, surgery can align physical characteristics with gender identity, to some extent.[22] The most common example: mastectomy can remove a transgender male's breasts. Perhaps 98% of all such surgeries are performed on adults, not minors.[23]

The motions now before the court deal directly only with GnRH agonists. The motions deal indirectly with cross-sex hormones, because to achieve their intended result, GnRH agonists are ordinarily followed by cross-sex hormones. The motions do not present any issue related to surgeries.

## VI.  General acceptance of the standards of care

The overwhelming weight of medical authority supports treatment of transgender patients with GnRH agonists and cross-sex hormones in appropriate circumstances. Organizations who have formally recognized this include the American Academy of Pediatrics, American Academy of Child and Adolescent

---

[20] Trial Tr. in *Dekker*, ECF No. 226 at 217–26, 228.
[21] *See* Trial Tr. in *Dekker*, ECF No. 228 at 87–90.
[22] *See* Trial Tr. in *Dekker*, ECF No. 227 at 42.
[23] *See* Trial Tr. in *Dekker*, ECF No. 227 at 43.

Psychiatry, American Academy of Family Physicians, American College of

Obstetricians and Gynecologists,  American College of Physicians, American

Medical Association, American Psychiatric Association, and at least a dozen

more.[24] The record also includes statements from hundreds of professionals

supporting this care.[25] At least as shown by this record, not a single reputable

medical association has taken a contrary position.

These medications—GnRH agonists, testosterone, and estrogen—have been

used for decades to treat other conditions. Their safety records and overall effects

are well known. The Food and Drug Administration has approved their use, though

not specifically to treat gender dysphoria.[26]

GnRH agonists are routinely used to treat patients with central precocious

puberty—children who have begun puberty prematurely—as well as, in some

circumstances, endometriosis and prostate cancer.[27] Central precocious puberty

presents substantial health risks and ordinarily should be treated. GnRH agonists

are an appropriate treatment, even though GnRH agonists have attendant risks.[28]

---

[24] *See* Pls.' Exs. 36–43, 45–48 in *Dekker*, ECF Nos. 175-36 through 176-8
(omitting ECF No. 176-4).
[25] *See* Amicus Brief of American Academies and Health Organizations, ECF No.
36-1; Bruggeman et al., *We 300 Florida health care professionals say the state
gets transgender guidance wrong* (Apr. 27, 2022), *Dekker* ECF No. 11-1 at 11–32.
[26] *See* Trial Tr. in *Dekker*, ECF No. 226 at 183; *see also* Trial Tr. in *Dekker*, ECF
No. 239 at 54–56.
[27] Trial Tr. in *Dekker*, ECF No. 226 at 183–84, 200–02.
[28] *Id.*

So, too, gender dysphoria presents substantial health risks and ordinarily should be treated.[29] For some patients, GnRH agonists are an appropriate treatment, even though, just as with their use to treat central precocious puberty and other conditions, GnRH agonists have attendant risks.[30]

The medical defendants say the risks attendant to use of GnRH agonists to treat central precocious puberty or to treat gender dysphoria are not identical, and that may be so. But it is still true that for gender dysphoria, just as for central precocious puberty, GnRH agonists are an effective treatment whose benefits can outweigh the risks.

The same is true for cross-sex hormones. Testosterone and estrogen are routinely used to treat cisgender patients in appropriate circumstances.[31] The medications are an effective treatment for conditions that should be treated, even though the medications have attendant risks.[32] That is so for cisgender and transgender patients alike. For some transgender patients, cross-sex hormones are an appropriate treatment.

Even the defendants' expert Dr. Levine testified that treatment with GnRH agonists and cross-sex hormones is sometimes appropriate.[33] He would demand

---

[29] Id.

[30] Id. at 201–16.

[31] Id. at 216.

[32] Id. at 218–29.

[33] Trial Tr. in Dekker, ECF No. 239 at 81–83.

appropriate safeguards, as discussed below, but he would not ban the treatments.[34] Nothing in this record suggests these plaintiffs do not qualify for treatment under Dr. Levine's proposed safeguards.

## VII. Clinical evidence supporting the standards of care

The record includes testimony of well-qualified doctors who have treated thousands of transgender patients with GnRH agonists and cross-sex hormones over their careers and have achieved excellent results. I credit the testimony of Dr. Dan Karasic (psychiatrist), Dr. Daniel Shumer (pediatric endocrinologist), Dr. Aron Janssen (child and adolescent psychiatrist), Dr. Johanna Olson-Kennedy (specialist in pediatrics and adolescent medicine), and Dr. Armand Antommaria (pediatrician and bioethicist). I credit their testimony that denial of this treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide.

The clinical evidence would support, though certainly not mandate, a decision by a reasonable patient and parent, in consultation with properly trained practitioners, to use GnRH agonists at or near the onset of puberty and to use cross-sex hormones later, even when fully apprised of the current state of medical knowledge and all attendant risks. There is no rational basis for a state to categorically ban these treatments.

---

[34] *Id.* at 91–94.

The record includes no evidence that these treatments have caused substantial adverse clinical results in properly screened and treated patients.

## VIII.  The plaintiffs

The plaintiffs and their children are proceeding under pseudonyms. The plaintiffs seeking a preliminary injunction are Jane Doe on behalf of Susan Doe, Gloria Goe on behalf of Gavin Goe, and Linda Loe on behalf of Lisa Loe.

### A.  Susan Doe

Susan Doe is an 11-year-old transgender girl. From a young age, she consistently told her mother she was a girl. She experienced extreme anxiety and distress about wearing boys' clothing.[35] Her mother sought help from a pediatrician, who said Susan should be allowed to dress and play as made her comfortable. Despite fears, her mother allowed her to wear girls' clothes and socially transition. This made Susan a "different child" who was "happy, glowing, [and] secure."[36]

Susan's school peers know her as a girl.[37] They do not know she is transgender. Her legal documentation and government-issued identification say she is female.[38]

---

[35] Jane Doe Decl., ECF No. 30-1 at 2–3 ¶ 8.

[36] *Id.* at 3 ¶ 12.

[37] *Id.* at 4 ¶ 14.

[38] *Id.* ¶ 16.

Susan's treating professionals have included the physician at the Pentagon who oversees the United States military's transgender health program[39] and a multidisciplinary team at the University of Florida Health Youth Gender Program.[40] All of Susan's providers have determined GnRH agonists will be medically necessary when she begins puberty—that is, when she reaches the puberty classification denominated Tanner stage II. This could happen any day.[41]

The statute and rules at issue, unless enjoined, will force Susan to go through male puberty. This will "out" her as transgender to her peers and will have devasting physical, emotional, and psychological effects.

### B. Gavin Goe

Gloria Goe is the mother of Gavin Goe, an eight-year-old transgender boy. From a very young age, Gavin wanted short hair, masculine clothing, and a boy's name. He experienced distress and asked his mother why no one believed he was a boy.[42] His mother came to understand Gavin was transgender, and she sought to learn how best to support and love her child. She allowed Gavin to socially

---

[39] *Id.* at 4–5 ¶ 17.
[40] *Id.* at 5 ¶¶ 18–19.
[41] *Id.* at 6 ¶ 20.
[42] Gloria Goe Decl., ECF No. 30-3 at 3 ¶ 10.

transition, including by using a boy's name and wearing boy's clothing.[43] Gavin's teacher, counselor, and principal know Gavin is transgender, but his peers do not.[44]

Gavin's pediatrician referred him to a psychologist for treatment of gender dysphoria, anxiety, and depression.[45] Now, at age eight, Gavin is younger than the average age of puberty onset, but his sister began puberty at age nine, so Gavin, too, may begin puberty early.[46] The pediatrician has referred Gavin to a pediatric endocrinologist at the Johns Hopkins Children's Hospital gender clinic in St. Petersburg, Florida, to assess possible treatment with GnRH agonists.[47] Gavin had an appointment, but it was canceled when the Board of Medicine adopted the rule prohibiting doctors from providing this kind of care.[48]

### C. Lisa Loe

Linda Loe is the mother of Lisa Loe, an 11-year-old transgender girl. Lisa has always gravitated toward interests and activities more stereotypically associated with girls. At age 9, Lisa told her mother she was a girl.

Lisa suffered gender dysphoria.[49] Her family sought the care of a psychologist. Lisa was allowed to socially transition, and her happiness and well-

---

[43] *Id.* ¶ 11.
[44] *Id.* at 3–4 ¶ 14.
[45] *See* ECF No. 86 at 9.
[46] Gloria Goe Decl., ECF No. 30-3 at 4 ¶ 15; *see id.* at 8.
[47] Gloria Goe Decl., ECF No. 30-3 at 4 ¶ 17; *see also* ECF No. 86 at 9.
[48] Gloria Goe Decl., ECF No. 30-3 at 4 ¶ 17.
[49] Linda Loe Decl., ECF No. 30-2 at 3 ¶ 7.

being improved.[50] But her classmates and teachers continued to treat her as a boy,

causing more distress. Her mother eventually decided to move Lisa to a more

supportive and inclusive school.

Lisa's pediatrician referred her to a pediatric endocrinologist who specializes

in the treatment of gender dysphoria.[51] The endocrinologist in turn referred Lisa to

a gender clinic.[52] She has begun puberty and needs GnRH agonists without further

delay.[53]

Lisa has become extremely anxious as her puberty progresses.[54]

### D. Findings on appropriate treatment

I find, based on the record now before the court, that the plaintiffs are likely

to succeed on their claim that they have obtained appropriate medical care for their

children to this point, that qualified professionals have properly evaluated the

children's medical conditions and needs in accordance with the well-established

standards of care, and that the plaintiffs and their children, in consultation with

their treating professionals, have determined that the benefits of treatment with

GnRH agonists, and eventually with cross-sex hormones, will outweigh the risks. I

find that the plaintiffs' ability to evaluate the benefits and risks of treating their

---

[50] *Id.*
[51] *Id.* at 4 ¶ 10.
[52] ECF No. 86 at 1–2.
[53] Linda Loe Decl., ECF No. 30-2 at 4 ¶ 11; *see also* ECF No. 86 at 2.
[54] Linda Loe Decl., ECF No. 30-2 at 5 ¶ 12.

individual children this way far exceeds the ability of the State of Florida to do so. I find that the plaintiffs' motivation is love for their children and the desire to achieve the best possible treatment for them. This is not the State's motivation.

## IX.  Equal protection

The plaintiffs assert banning treatment with GnRH agonists and cross-sex hormones violates the Fourteenth Amendment's Equal Protection Clause. The only circuit that has addressed the issue agrees. In *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022), the Eighth Circuit affirmed a preliminary injunction against enforcement of an Arkansas statute identical in relevant respects to the statute at issue here. The decision is on point, well reasoned, and should be followed. But as an Eighth Circuit decision, it is not binding.

### A. *Introduction to levels of scrutiny*

Equal-protection analysis often starts with attention to the appropriate level of scrutiny: strict, intermediate, or rational-basis.

There was a time when the Supreme Court seemed to treat strict scrutiny and rational basis as exhaustive categories of equal-protection review. A leading commentator said that in some situations the first category was "'strict' in theory and fatal in fact" while the second called for "minimal scrutiny in theory and virtually none in fact." Gerald Gunther, *The Supreme Court, 1971 Term—*

*Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1972).

But in the decades since, the Supreme Court has applied *intermediate* scrutiny in many circumstances. And rational-basis review no longer means virtually no review. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) (striking down, for lack of a legitimate rational basis, a state law restricting local ordinances protecting gays: "[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985) (striking down, for lack of a legitimate rational basis, an ordinance requiring group-care facilities for the mentally handicapped, but not other facilities with multiple occupants, to obtain land-use permits); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985) (striking down, for lack of a legitimate rational basis, a tax exemption for Vietnam War veterans limited to those who resided in the state on May 8, 1976); *United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) (striking down, for lack of a legitimate rational basis, a statute denying food stamps to members of a household with unrelated members).

In short, regardless of the level of scrutiny, there is no substitute for careful, unbiased, intellectually honest analysis. Still, the level of scrutiny matters, so this order addresses it.

### B. Intermediate scrutiny applies here

The plaintiffs say the challenged statute and rules discriminate on the basis of sex and transgender status and that either alone would be sufficient to trigger intermediate scrutiny. The defendants say only rational-basis scrutiny applies. The plaintiffs have the better of it.

### 1. Sex

It is well established that drawing lines based on sex triggers intermediate scrutiny. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996); *Adams v. St. Johns Cnty.*, 57 F.4th 791 801 (11th Cir. 2022) (en banc). If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020); *Adams*, 57 F.4th at 801. The defendants do not deny this; instead, they say the challenged statute does not draw a line based on sex.

But it does. Consider an adolescent, perhaps age 16, that a physician wishes to treat with testosterone. Under the challenged statute, is the treatment legal or illegal? To know the answer, one must know the adolescent's sex. If the adolescent is a natal male, the treatment is legal. If the adolescent is a natal female, the

treatment is illegal. This is a line drawn on the basis of sex, plain and simple. *See Brandt*, 47 F.4th at 669 ("Because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law, [the law] discriminates on the basis of sex."); *Adams*, 57 F.4th at 801 (applying intermediate scrutiny to a policy under which entry into a designated bathroom was legal or not depending on the entrant's natal sex).

In asserting the contrary, the defendants note that the reason for the treatment—the diagnosis—is different for the natal male and natal female. Indeed it is. But this does not change the fact that this is differential treatment based on sex. The *reason* for sex-based differential treatment is the purported *justification* for treating the natal male and natal female differently—the justification that must survive intermediate scrutiny. One can survive—but cannot avoid—intermediate scrutiny by saying there is a good reason for treating a male and female differently.

### 2. *Gender nonconformity*

Drawing a line based on gender nonconformity—this includes transgender status—also triggers intermediate scrutiny. *See Glenn v. Brumby*, 663 F.3d 1313, 1316 (11th Cir. 2011). Although the defendants deny it, the statute and rules at issue draw lines based on transgender status. *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1147 (M.D. Ala. 2022) (citing *Glenn*, 663 F.3d at 1317).

To confirm this, consider a child that a physician wishes to treat with GnRH agonists to delay the onset of puberty. Is the treatment legal or illegal? To know the answer, one must know whether the child is cisgender or transgender. The treatment is legal if the child is cisgender but illegal if the child is transgender, because the statute prohibits GnRH agonists only for transgender children, not for anyone else. The theoretical but remote-to-the-point-of-nonexistent possibility that a child will be identified as transgender before needing GnRH agonists for the treatment of central precocious puberty does not change the essential nature of the distinction.

Adverse treatment of transgender individuals should trigger intermediate scrutiny for another reason, too. In *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938), the Court suggested heightened scrutiny might be appropriate for statutes showing "prejudice against discrete and insular minorities." Courts have continued to apply the discrete-and-insular-minority construct. *See, e.g.*, *Foley v. Connelie*, 435 U.S. 291, 294–95 (1978) (citing *Carolene Products* and noting that "close scrutiny" applies to equal-protection claims of resident aliens, who lack access to the political process); *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019) (citing *Carolene Products*; recognizing that, under *Foley*, heightened scrutiny applies to resident aliens; but declining to afford the same

treatment to illegal immigrants). Transgender individuals are a discrete and insular minority.

The Supreme Court further explained this basis for heightened scrutiny in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447–50 (1985). There the Court declined to extend strict or even intermediate scrutiny to intellectually disabled individuals—those with very limited mental ability. But the Court gave two explanations that support a different result for transgender individuals.

First, *City of Cleburne* noted that strict scrutiny applies when the characteristic at issue is almost never a legitimate reason for governmental action. Race is the paradigm—leaving aside affirmative action as a remedy for prior discrimination, it is almost never appropriate to parcel out government benefits or burdens based on race. Transgender status is much the same. Transgender status is rarely an appropriate basis on which to parcel out government benefits or burdens.

Second, *Carolene Products* and *Foley* both referred to a minority's lack of political voice as a basis for heightened scrutiny. *City of Cleburne* noted that the class of intellectually disabled individuals had garnered considerable public and political support—that this was not a class lacking political access. The same is not true of transgender individuals, who continue to suffer widespread private opprobrium and governmental discrimination, notably in the statute and rules now under review. This is precisely the kind of government action, targeted at a discrete

and insular minority, for which heightened scrutiny is appropriate. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020) (holding transgenders are a quasi-suspect class); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (same). *But see Adams*, 57 F.4th at 803 n.5 (noting that whether transgender status is a quasi-suspect class was not at issue there but, in dictum, expressing "grave doubt").

In any event, *City of Cleburne* is important for another reason, too. The Court applied rational-basis scrutiny, but it was *meaningful* rational-basis scrutiny. The Court did not blindly accept a proffered reason for the city's action that did not withstand meaningful analysis. The defendants' proffered reasons here, like those in *City of Cleburne*, do not withstand meaningful analysis. *See Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (affirming a preliminary injunction and holding the plaintiffs were likely to prevail on their equal-protection challenge to an Arkansas statute banning gender-affirming care for minors); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. May 13, 2022) (granting a preliminary injunction and holding plaintiffs were likely to prevail on their equal-protection and parental-rights challenge to Alabama's ban on puberty blockers and cross-sex hormones).

### 3. *Cases involving identical, not different, treatment of classes*

In opposing heightened scrutiny, the defendants cite *Geduldig v. Aiello*, 417 U.S. 484 (1974), for the proposition that heightened scrutiny does not apply when there are members of the allegedly disfavored class on both sides of the challenged classification. *Geduldig* held that exclusion of pregnancy from state employees' health coverage was not sex discrimination. Some women become pregnant, some do not. The defendants say this is why the challenged provision did not discriminate based on sex—there were women on both sides. Note, though, that men and women were treated the same: nobody had health coverage for pregnancy. When men and women are treated the same, the Court reasoned, it is not intentional sex discrimination, even if the challenged provision has a disparate impact.

The situation is different here. Transgender and cisgender individuals are not treated the same. Cisgender individuals can be and routinely are treated with GnRH agonists, testosterone, or estrogen, when they and their doctors deem it appropriate. Not so for transgender individuals—the challenged statute and rules prohibit it. To know whether treatment with any of these medications is legal, one must know whether the patient is transgender. And to know whether treatment with testosterone or estrogen is legal, one must know the patient's natal sex.

This is differential treatment based on sex and transgender status. *Geduldig* is not to the contrary. Intermediate scrutiny applies.

### C. *Applying the proper level of scrutiny*

To survive intermediate scrutiny, a state must show that its classification is substantially related to a sufficiently important interest. *Adams*, 57 F.4th at 801 (cleaned up); *see also Glenn*, 663 F.3d at 1316. To survive rational-basis scrutiny, a state must show a rational relationship to a legitimate state interest. *Romer*, 517 U.S. at 631. The challenged statute and rules survive neither level of scrutiny.

The record establishes that for some patients, including the three now at issue, a treatment regimen of mental-health therapy followed by GnRH agonists and eventually by cross-sex hormones is the best available treatment. These patients and their parents, in consultation with their doctors and multidisciplinary teams, have rationally chosen this treatment. The State of Florida's decision to ban the treatment is not rationally related to a legitimate state interest.

Dissuading a person from conforming to the person's gender identity rather than to the person's natal sex is not a legitimate state interest. The medical defendants have acknowledged this.[55] But the state's disapproval of transgender status—of a person's gender identity when it does not match the person's natal

---

[55] Trial Tr. in *Dekker*, ECF No. 242 at 97–98.

sex—was a substantial motivating factor in enactment of the challenged statute and rules.

Discouraging individuals from pursuing their gender identities, when different from their natal sex, was also a substantial motivating factor. In a "fact sheet," the Florida Department of Health asserted social transitioning, which involves no medical intervention at all, should not be a treatment option for children or adolescents.[56] Nothing could have motivated this remarkable intrusion into parental prerogatives other than opposition to transgender status itself.

State action motivated by purposeful discrimination, even if otherwise lawful, violates the Equal Protection Clause. *See Adams*, 57 F.4th at 810 (recognizing that an otherwise neutral law still violates the Equal Protection Clause when it is "motivated by 'purposeful discrimination'") (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979)); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321–22 (11th Cir. 2021). The statute and rules at issue were motivated in substantial part by the plainly illegitimate purposes of disapproving transgender status and discouraging individuals from pursuing their honest gender identities. This was purposeful discrimination against transgenders.

The plaintiffs are likely to succeed on their equal-protection claim.

---

[56] Defs.' Ex. 5 in *Dekker*, ECF No. 193-5 at 1.

## X. Parental rights

The plaintiffs also assert a claim under the Due Process Clause, which protects a parent's right to control a child's medical treatment. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality); *Parham v. J.R.*, 442 U.S. 584, 602–03 (1979); *Maddox v. Stephens*, 727 F.3d 1109, 1118–19 (11th Cir. 2013); *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990).

The defendants say a parent's right to control a child's medical treatment does not give the parent a right to insist on treatment that is properly prohibited on other grounds. Quite so. If the state could properly prohibit the treatments at issue as unsafe, parents would have no right to override the state's decision. But as set out above, there is no rational basis, let alone a basis that would survive heightened scrutiny, for prohibiting these treatments in appropriate circumstances.

The plaintiffs are likely to prevail on their parental-rights claim.

## XI. The pretextual justifications for the statute and rules

In support of their position, the defendants have proffered a laundry list of purported justifications for the statute and rules. The purported justifications are largely pretextual and, in any event, do not call for a different result.

### A. *"Low quality" evidence*

A methodology often used for evaluating medical studies—for evaluating research-generated evidence on the safety and efficacy of any given course of

treatment—is known as Grading of Recommendations, Assessment, Development, and Evaluation ("GRADE"). The defendants stridently assert that the evidence supporting the treatments at issue is "low" or "very low" quality as those terms are used in the GRADE system. But the evidence on the other side—the evidence purportedly showing these treatments are ineffective or unsafe—is far weaker, not just of "low" or "very low" quality. Indeed, evidence suggesting these treatments are ineffective is nonexistent.

The choice these plaintiffs face is binary: to use GnRH agonists and cross-sex hormones, or not. It is no answer to say the evidence on the yes side is weak when the evidence on the no side is weaker or nonexistent. There is substantial and persuasive, though not conclusive, research showing favorable results from these treatments.[57] A decision for the three patients at issue cannot wait for further or better research; the treatment decision must be made now.

Moreover, the fact that research-generated evidence supporting these treatments gets classified as "low" or "very low" quality on the GRADE scale does not mean the evidence is not persuasive, or that it is not the best available research-generated evidence on the question of how to treat gender dysphoria, or that medical treatments should not be provided consistent with the research results and clinical evidence.

---

[57] *See, e.g.*, Trial Tr. in Dekker, ECF No. 228 at 41–42.

It is commonplace for medical treatments to be provided even when supported only by research producing evidence classified as "low" or "very low" on this scale.[58] The record includes unrebutted testimony that only about 13.5% of accepted medical treatments across all disciplines are supported by "high" quality evidence on the GRADE scale.[59] The defendants' assertion that treatment should be banned based on the supporting research's GRADE score is a misuse of the GRADE system.

We put band-aids on cuts to keep dirt out not because there is "high" quality research-generated evidence supporting the practice but because we know, from clinical experience, that cuts come with a risk of infection and band-aids can reduce the risk.

Gender dysphoria is far more complicated, and one cannot know, with the same level of confidence, how to treat it. But there is now extensive clinical experience showing excellent results from treatment with GnRH agonists and cross-sex hormones. If these treatments are prohibited, many patients will suffer needlessly.[60] The extensive clinical evidence is important and indeed persuasive

---

[58] *See* Trial Tr. in *Dekker*, ECF No. 227 at 98–101.
[59] Trial Tr. in *Dekker*, ECF No. 226 at 68–69.
[60] Trial Tr. in *Dekker*, ECF No. 226 at 64; Trial Tr. in *Dekker*, ECF No. 238 at 97–98.

evidence, even if the supporting research has produced only "low" or "very low"

quality evidence on the GRADE scale.

When facing a binary decision to use or not use GnRH agonists or

hormones, a reasonable decisionmaker would consider the evidence on the yes

side, as well as the weaker evidence on the no side. Calling the evidence on the yes

side "low" or "very low" quality would not rationally control the decision.

## B. Risks attendant to treatment

The defendants assert there are risks attendant to treatment with GnRH

agonists and cross-sex hormones. Indeed there are. There are legitimate concerns

about fertility and sexuality that a child entering puberty is not well-equipped to

evaluate and for which parents may be less-than-perfect decisionmakers. There is a

risk of misdiagnosis, though the requirement in the standards of care for careful

analysis by a multidisciplinary team should minimize the risk. There is a risk that a

child later confronted with the bias that is part of our world will come to believe it

would have been better to try to pass as cisgender.

There also are studies suggesting not that there *are* but that there *may be*

additional medical risks. An unreplicated study found that sheep who took GnRH

agonists became worse at negotiating a maze, at least for a time. Another study

showed a not-statistically-significant but nonetheless-concerning decrease in IQ

among cisgender children treated for central precocious puberty with GnRH

agonists. These and other studies cited by the defendants would surely be rated low or very-low quality on the GRADE scale and, more importantly, are not very persuasive. The latter study has not led to a ban on the use of GnRH agonists to treat central precocious puberty. One cannot know from these studies whether treating transgender adolescents with GnRH agonists will cause comparable adverse results in some patients. But the risk that they will is a risk a decisionmaker should reasonably consider.

That there are risks does not end the inquiry. There are also substantial benefits for the overwhelming majority of patients treated with GnRH agonists and cross-sex hormones. And there are risks attendant to *not* using these treatments, including the risk—in some instances, the near certainty—of anxiety and depression and even suicidal ideation. The challenged statute ignores the benefits that many patients realize from these treatments and the substantial risk posed by foregoing the treatments—the risk from failing to pursue what is, for many, the most effective available treatment of gender dysphoria. One of the *Dekker* plaintiffs attempted suicide four times before beginning successful treatment with cross-sex hormones; he is now thriving.[61]

If the three plaintiffs at issue here do not start GnRH agonists soon, they will go through puberty consistent with their natal sex. They will live with the

---

[61] Trial Tr. in *Dekker*, ECF No. 228 at 150 & 166–67.

consequences for the rest of their lives. The likelihood is very high that they will suffer attendant adverse mental-health consequences. If, on the other hand, they *do* get GnRH agonists, they will avoid some of the adverse consequences. They also will face attendant risks.

Risks attend many kinds of medical treatment, perhaps most. Ordinarily it is the patient, in consultation with the doctor, who weighs the risks and benefits and chooses a course of treatment. What is remarkable about the challenged statute and rules is not that they address medical treatments with both risks and benefits but that they arrogate to the state the right to make the decision. And worse, the statute and rules make the same decision for everybody, without considering any patient's individual circumstances. The statute and rules do this in contravention of widely accepted standards of care.

That there are risks of the kind presented here is not a rational basis for denying patients the option to choose this treatment.

### C. Bias in medical organizations

The defendants say the many professional organizations that have endorsed treatment of gender dysphoria with GnRH agonists and hormones all have it wrong. The defendants say, in effect, that the organizations were dominated by individuals who pursued good politics, not good medicine.

If ever a pot called a kettle black, it is here. The statute and the rules were an exercise in politics, not good medicine.

This is a politically fraught area. There has long been, and still is, substantial bigotry directed at transgender individuals. Common experience confirms this, as does a Florida legislator's remarkable reference to transgender witnesses at a committee hearing as "mutants" and "demons."[62] And even when not based on bigotry, there are those who incorrectly but sincerely believe that gender identity is not real but instead just a choice. This is, as noted above, the elephant in the room.

Where there is bigotry, there are usually—one hopes, always—opponents of bigotry. It is hardly surprising that doctors who understand that transgender identity can be real, not made up—doctors who are willing to provide supportive medical care—oppose anti-transgender bigotry.

It sometimes happens that opponents of bigotry deem opposing viewpoints bigoted even when they are not. And it sometimes happens that those with

---

[62] *Hearing on Facility Requirements Based on Sex*, CS/HB 1521 2023 Session (Fla. Apr. 10, 2023), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8804 (time stamp 2:30:35 to 2:34:10). Representative Webster Barnaby said to transgender Florida citizens who spoke at the hearing that they were "mutants living among us on Planet Earth." He raised his voice and said, "[T]his is Planet Earth, where God created men, male and women, female!" He continued: "[T]he Lord rebuke you Satan and all of your demons and imps that come parade before us. That's right I called you demons and imps who come and parade before us and pretend that you are part of this world." Finally, he said, you can "take [him] on" but he "promises [he] will win every time."

opposing viewpoints are slow to speak up, lest they be accused of bigotry. These dynamics could affect a medical association's consideration of transgender treatment. The record suggests these dynamics *have* affected the tone and quality of debate within WPATH. It is entirely possible that the same dynamics could have affected the tone and quality of debate within other associations.

Even so, it is fanciful to believe that all the many medical associations who have endorsed gender-affirming care, or who have spoken out or joined an amicus brief supporting the plaintiffs in this litigation, have so readily sold their patients down the river. The great weight of medical authority supports these treatments. The widely accepted standards of care require competent therapy and careful evaluation by a multidisciplinary team before use of GnRH agonists and cross-sex hormones for treatment of gender dysphoria. But the widely accepted standards of care support their use in appropriate circumstances. The standards have been unanimously endorsed by reputable medical associations, even though not unanimously endorsed by all the members of the associations.

The overwhelming majority of doctors are dedicated professionals whose first goal is the safe and effective treatment of their patients. There is no reason to believe the doctors who adopted these standards were motivated by anything else.

### D. International views

The defendants have asserted time and again that Florida now treats GnRH agonists and cross-sex hormones the same as European countries. A heading in the defendants' response to the current motions is typical: "Florida Joins the International Consensus." The assertion is false. And no matter how many times the defendants say it, it will still be false. No country in Europe—or so far as shown by this record, anywhere in the world—entirely bans these treatments.

To be sure, there are countries that ban gays and lesbians and probably transgender individuals, too. One doubts these treatments are available in Iran or other similarly repressive regimes. But the treatments are available in appropriate circumstances in all the countries cited by the defendants, including Finland, Sweden, Norway, Great Britain, France, Australia, and New Zealand.[63] Some or all of these insist on appropriate preconditions and allow care only in approved facilities—just as the Endocrine Society and WPATH standards insist on appropriate preconditions, and just as care in the United States is ordinarily provided through capable facilities. Had Florida truly joined the international consensus—making these treatments available in appropriate circumstances or in

---

[63] *See* Trial Tr. in *Dekker*, ECF No. 226 at 78–79; *see also* Trial Tr. in *Dekker*, ECF No. 227 at 134; Trial Tr. in *Dekker*, ECF No. 228 at 61–62.

approved facilities—these plaintiffs would qualify, and the instant motions would not be necessary.

### E. Malpractice

The defendants assert, with no real evidentiary support, that GnRH agonists and cross-sex hormones have sometimes been provided in Florida without the appropriate mental-health therapy and evaluation by a multidisciplinary team.

If that were true, the solution would be to appropriately regulate these treatments, not to ban them. And there are, of course, remedies already in place in Florida for deficient medical care. There is no evidence that this kind of care is routinely provided so badly that it should be banned outright.

Along the same lines, the defendants say gender dysphoria is difficult to diagnose accurately—that gender identity can be fluid, that there is no objective test to confirm gender identity or gender dysphoria, and that patients treated with GnRH agonists or cross-sex hormones have sometimes come to regret it. But the defendants ignore facts that do not support their narrative. Fluidity is common prior to puberty but not thereafter. Regret is rare; indeed, the defendants have offered no evidence of any Florida resident who regrets being treated with GnRH agonists or cross-sex hormones. And the absence of objective tests to confirm gender dysphoria does not set it apart from many other mental-health conditions

that are routinely diagnosed without objective tests and treated with powerful medications.

The difficulty diagnosing a patient calls for caution. It does not call for a one-size-fits-all refusal to provide widely accepted medical treatment.[64] It does not call for the state to make a binary decision not to provide the treatment even for a properly diagnosed patient.

### F. Continuation of treatment

The defendants note that 98% or more of adolescents treated with GnRH agonists progress to cross-sex hormones. That is hardly an indictment of the treatment; it is instead consistent with the view that in 98% or more of the cases, the patient's gender identity did not align with natal sex, this was accurately determined, and the patient was appropriately treated first with GnRH agonists and later with cross-sex hormones. An advocate who denies the existence of genuine transgender identity or who wishes to make everyone cisgender might well fear progression to cross-sex hormones, but the defendants have denied that this is a basis for their current reference to this progression.

The defendants say, instead, that the high rate of progression rebuts an argument in support of GnRH agonists: that GnRH agonists give a patient time to

---

[64] *See* Trial Tr. in *Dekker*, ECF No. 239 at 91–94 (defense expert Dr. Levine explaining that medical intervention such as puberty blockers and hormones should be carefully prescribed and monitored but not banned).

reflect on the patient's gender identity and, if still convinced of a gender identity opposite the natal sex, to reflect on whether to go forward socially in the gender identity or natal sex. But if that is a goal of treatment with GnRH agonists, it is certainly not the treatment's *primary* goal. The primary goal is to delay and eventually avoid development of secondary sex characteristics inconsistent with the patient's gender identity—and thus to avoid or reduce the attendant anxiety, depression, and possible suicidal ideation.

The high rate of progression from GnRH agonists to cross-sex hormones is not a reason to ban the treatments.

### G. Off-label use of FDA-approved drugs

The defendants note that while the Food and Drug Administration has approved GnRH agonists and the hormones at issue as safe and effective, the agency has not addressed their use to treat gender dysphoria. Quite so. Use of these drugs to treat gender dysphoria is "off label."

That the FDA has not approved these drugs for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose. Off-label use of drugs is commonplace and widely accepted across the medical profession. The defendants' contrary implication is divorced from reality.

Obtaining FDA approval of a drug is a burdensome, expensive process.[65] A pharmaceutical provider who wishes to market a new drug must incur the burden and expense because the drug cannot be distributed without FDA approval. Once a drug has been approved, however, the drug can be distributed not just for the approved use but for any other use as well. There ordinarily is little reason to incur the burden and expense of seeking additional FDA approval.

That the FDA approved these drugs at all confirms that, at least for one use, they are safe and effective.[66] This provides some support for the view that they are safe when properly administered and that they effectively produce the intended results—that GnRH agonists delay puberty and that testosterone and estrogen have masculinizing or feminizing effects as expected. The FDA approval goes no further—it does not address one way or the other the question whether using these drugs to treat gender dysphoria is as safe and effective as on-label uses.

That use of GnRH agonists and cross-sex hormones to treat gender dysphoria is "off-label" is not a reason to ban their use for that purpose.

## XII.  Other prerequisites to a preliminary injunction

The plaintiffs have met the other prerequisites for a preliminary injunction. The plaintiffs' adolescent children will suffer irreparable harm—the unwanted and

---

[65] Trial Tr. in *Dekker*, No. 226 at 182–84; Trial Tr. in *Dekker* No. 227 at 120–23; Trial Tr. in *Dekker*, ECF No. 239 at 54–55.

[66] Trial Tr. in *Dekker*, No. 226 at 182–84; Trial Tr. in *Dekker* No. 227 at 120–23.

irreversible onset and progression of puberty in their natal sex—if they do not promptly begin treatment with GnRH agonists. The treatment will affect the patients themselves, nobody else, and will cause the defendants no harm. The preliminary injunction will be consistent with, not adverse to, the public interest. Adherence to the Constitution is always in the public interest.

## XIII.  Improper defendants

The plaintiffs seek prospective relief under 42 U.S.C. § 1983. They are entitled to such relief against appropriate state officials in their official capacity. *See Ex parte Young*, 209 U.S. 123 (1908).

The Attorney General's motion asserts she is not an appropriate defendant—that she has no authority to enforce, and no other involvement with, the challenged statute and rules. That may be correct. The preliminary injunction will not run against the Attorney General, at least pending a ruling on her motion to dismiss.

A state itself is not a "person" who may be held liable under § 1983, and in any event a state has Eleventh Amendment immunity from a § 1983 claim in federal court. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) (holding that a state is not a "person" within the meaning of § 1983); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) (holding that a state sued in its own name has Eleventh Amendment immunity, regardless of the relief sought, unless

the immunity has been waived or validly abrogated by Congress under the Fourteenth Amendment).

The defendants Florida Board of Medicine and Florida Board of Osteopathic Medicine are agencies of the state—the jurisdictional equivalent of the state itself. Their presence in the case may be, in any event, merely redundant to that of their individual members, acting in their official capacities. *Cf. Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (approving the dismissal of official-capacity defendants whose presence was merely redundant to the naming of an institutional defendant).

This order does not resolve the question whether the Boards will stay in the case. But the preliminary injunction will run against the Board members, not the Boards themselves. A broader preliminary injunction is not needed.

## XIV. Conclusion

Gender identity is real. Those whose gender identity does not match their natal sex often suffer gender dysphoria. The widely accepted standard of care calls for evaluation and treatment by a multidisciplinary team. Proper treatment begins with mental-health therapy and is followed in appropriate cases by GnRH agonists and cross-sex hormones. Florida has adopted a statute and rules that prohibit these treatments even when medically appropriate. The plaintiffs are likely to prevail on

their claim that the prohibition is unconstitutional. And they have met the other prerequisites to a preliminary injunction.

The plaintiffs thus are entitled to a preliminary injunction of appropriate scope. Federal Rule of Civil Procedure 65(c) requires a party who obtains a preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." This order requires the plaintiffs to give security for costs in a modest amount. Any party may move at any time to adjust the amount of security.

IT IS ORDERED:

1. The motion for a preliminary injunction, ECF Nos. 30 and 57, is granted in part.

2. The motion for a temporary restraining order, ECF No. 57, is denied as moot.

3. A preliminary injunction is entered against these defendants: Joseph Ladapo, in his capacity as the Surgeon General of the Florida Department of Health; Scot Ackerman, Nicholas W. Romanello, Wael Barsoum, Matthew R. Benson, Gregory Coffman, Amy Derick, David Diamond, Patrick Hunter, Luz Marina Pages, Eleonor Pimentel, Hector Vila, Michael Wasylik, Zachariah P. Zachariah, Maria Garcia, and Nicole Justice, in their official capacities as members

of the Florida Board of Medicine; Watson Ducatel, Tiffany Sizemore Di Pietro,

Gregory Williams, Monica Mortensen, Valerie Jackson, Chris Creegan, and

William D. Kirsh, in their official capacities as members of the Florida Board of

Osteopathic Medicine; and State Attorneys Ginger Bowen Madden, Jack

Campbell, John Durrett, Melissa Nelson, William Gladson, Bruce Bartlett, R.J.

Larizza, Brian S. Kramer, Monique H. Worrell, Brian Haas, Kathern Fernandez

Rundle, Ed Brodsky, Susan S. Lopez, Larry Basford, Dave Aronberg, Dennis

Ward, Harold F. Pryor, Phil Archer, Thomas Bakkedahl, and Amira D. Fox, in

their official capacities.

4. The preliminarily enjoined parties must not take any steps to prevent the

administration of GnRH agonists or cross-sex hormones to Susan Doe, Gavin Goe,

or Lisa Loe in accordance with professional standards that would apply to use of

the same substances to treat patients with other medical conditions.

5. The preliminarily enjoined parties must not take any steps to enforce

against Susan Doe, Gavin Goe, or Lisa Loe, or their parents or healthcare

providers, Florida Statutes § 456.52(1) & (5) or Florida Administrative Code rules

64B8-9.019(1)(b) or 64B15-14.014(1)(b).

6. This preliminary injunction will take effect upon the posting of security in

the amount of $100 for costs and damages sustained by a defendant found to have

been wrongfully enjoined. Security may be posted by a cash deposit with the Clerk of Court.

7. This preliminary injunction will terminate upon entry of a final judgment or when otherwise ordered.

8. This preliminary injunction binds the defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

SO ORDERED on June 6, 2023.

s/Robert L. Hinkle
United States District Judge