No. 23-12159

═══════════════════════════════════════

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

───────────────────────────────────────

*Jane Doe et al.*,
Plaintiffs-Appellees,

v.

*Surgeon General, State of Florida et al.*,
Defendants-Appellants.

U.S. District Court for the Northern District of Florida, No. 4:23-cv-114
(Hinkle, J.)

───────────────────────────────────────

# DEFENDANTS-APPELLANTS' INITIAL BRIEF

───────────────────────────────────────

Mohammad O. Jazil
Michael Beato
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690

*Counsel for Defendants-Appellants Florida Surgeon General, Florida Department of Health, Florida Board of Medicine and Individual Members, and Florida Board of Osteopathic Medicine and Individual Members*

Ashley Moody
*Attorney General of Florida*

Henry C. Whitaker
  *Solicitor General*
Joseph E. Hart
  *Counselor to the Attorney General*
PL-01 the Capitol
Tallahassee, FL 32399
(850) 414-3300

*Counsel for Defendants-Appellants William Gladson, Florida Surgeon General, and Florida Department of Health*

*Jane Doe et al. v. Surgeon General, State of Florida et al.,*
No. 23-12159

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Per Rule 26.1 and Circuit Rule 26.1, Defendants-Appellants certify that the following have an interest in the outcome of this case:

1.    Academic Pediatric Association, *Amicus*

2.    Ackerman, Scot, *Defendant*

3.    American Academy of Child and Adolescent Psychiatry, *Amicus*

4.    American Academy of Family Physicians, *Amicus*

5.    American Academy of Nursing, *Amicus*

6.    American Academy of Pediatrics, *Amicus*

7.    American Association of Physicians for Human Rights, Inc., *Amicus*

8.    American College of Obstetricians and Gynecologists, *Amicus*

9.    American College of Osteopathic Pediatricians, *Amicus*

10.   American College of Physicians, *Amicus*

11.   American Medical Association, *Amicus*

12.   American Pediatric Society, *Amicus*

13.   Antommaria, Armand, *Dekker Witness*[*]

---

[*] As the district court stated in its preliminary-injunction order, the preliminary injunction was decided on "the written filings in this case *and the record compiled in a separate case in this court with overlapping issues,* Dekker v. Weida*, No. 4:22cv325-RH-MAF.*" Doc.90 at 2 (emphasis added). Therefore, expert and expert-related witnesses in the *Dekker* case are included in this CIP. The *Dekker* case is now on appeal in this Court. 23-12155.

*Jane Doe et al. v. Surgeon General, State of Florida et al.*,
No. 23-12159

14.    Archer, Phil, *Former Defendant*

15.    Aronberg, Dave, *Former Defendant*

16.    Association of American Medical Colleges, *Amicus*

17.    Association of Medical School Pediatric Department Chairs, Inc., *Amicus*

18.    Baker, Kellan, *Dekker Witness*

19.    Bakkedahl, Thomas, *Former Defendant*

20.    Barsoum, Wael, *Defendant*

21.    Bartlett, Bruce, *Former Defendant*

22.    Basford, Larry, *Former Defendant*

23.    Beato, Michael, *Counsel for Defendants*

24.    Bell, Daniel, *Counsel for Defendants*

25.    Benson, Matthew, *Defendant*

26.    Biggs, Michael, *Defendant Witness*

27.    Boe, Bennett, *Plaintiff*

28.    Boe, Brenda, *Plaintiff*

29.    Brackett, Matthew, *Dekker Witness*

30.    Brodsky, Ed, *Former Defendant*

31.    Bruggeman, Brittany, *Declarant*

32.    Bruno, Nichole, *Plaintiff Gavin Goe's Doctor*

33.    Campbell, Jack, *Former Defendant*

34.    Cantor, James, *Dekker Witness*

*Jane Doe et al. v. Surgeon General, State of Florida et al.,*
No. 23-12159

35.　　Chriss, Simone, *Counsel for Plaintiffs*

36.　　Coe, Carla, *Plaintiff*

37.　　Coe, Christina, *Plaintiff*

38.　　Coffman, Gregory, *Defendant*

39.　　Creegan, Chris, *Defendant*

40.　　Derick, Amy, *Defendant*

41.　　Di Pietro, Tiffany, *Defendant*

42.　　Diamond, David, *Defendant*

43.　　Doe, Jane, *Plaintiff*

44.　　Doe, Susan, *Plaintiff*

45.　　Donovan, Kevin, *Dekker Witness*

46.　　Ducatel, Watson, *Defendant*

47.　　Dunn, Chelsea, *Counsel for Plaintiffs*

48.　　Durrett, John, *Former Defendant*

49.　　Edmiston, Kale, *Dekker Witness*

50.　　Endocrine Society, *Amicus*

51.　　English, Jeffrey, *Dekker Witness*

52.　　Erchull, Christopher, *Counsel for Plaintiffs*

53.　　Florida Agency for Healthcare Administration, *Dekker Defendant*

54.　　Florida Board of Medicine, *Defendant*

55.　　Florida Board of Osteopathic Medicine, *Defendant*

*Jane Doe et al. v. Surgeon General, State of Florida et al.,*
No. 23-12159

56.   Florida Chapter of the American Academy of Pediatrics, *Amicus*

57.   Foe, Fiona, *Plaintiff*

58.   Foe, Freya, *Plaintiff*

59.   Fox, Amira, *Former Defendant*

60.   Garcia, Maria, *Defendant*

61.   Ginsburg, Maya, *Counsel for Plaintiffs*

62.   Gladson, William, *Defendant*

63.   Goe, Gavin, *Plaintiff*

64.   Goe, Gloria, *Plaintiff*

65.   Goldberg, Noah, *Counsel for Amicus*

66.   Haas, Brian, *Former Defendant*

67.   Hart, Joseph, *Counsel for Defendants*

68.   Hinkle, Robert, *U.S. District Court Judge*

69.   Hruz, Paul William, *Dekker Witness*

70.   Hunter, Patrick, *Defendant*

71.   Hutton, Kim, *Dekker Witness*

72.   Isasi, William, *Counsel for Amicus*

73.   Jackson, Valerie, *Defendant*

74.   Jacobs, Arthur, *Counsel for Former Defendants & Defendant*

75.   Janssen, Aron Christopher, *Dekker Witness & Doe Declarant*

76.   Jazil, Mohammad, *Counsel for Defendants*

*Jane Doe et al. v. Surgeon General, State of Florida et al.,*
No. 23-12159

77.  Justice, Nicole, *Defendant*

78.  Kaliebe, Kristopher Edward, *Dekker Witness*

79.  Karasic, Dan, *Dekker Witness*

80.  Kirsh, William, *Defendant*

81.  Kramer, Brian, *Former Defendant*

82.  Ladapo, Joseph, *Defendant*

83.  Laidlaw, Michael, *Dekker Witness*

84.  Lannin, Cortlin, *Counsel for Amicus*

85.  Lappert, Patrick, *Dekker Witness*

86.  Larizza, R.J., *Former Defendant*

87.  Levi, Jennifer, *Counsel for Plaintiffs*

88.  Levine, Stephen, *Dekker Witness*

89.  Loe, Linda, *Plaintiff*

90.  Loe, Lisa, *Plaintiff*

91.  Lopez, Susan, *Former Defendant*

92.  Madden, Ginger, *Former Defendant*

93.  Mandelbaum, Sara, *Counsel for Plaintiffs*

94.  Marstiller, Simone, *Dekker Former Defendant*

95.  Minter, Shannon, *Counsel for Plaintiffs*

96.  Mondry, Emily, *Counsel for Amicus*

97.  Moody, Ashley, *Former Defendant*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*,
No. 23-12159

98.    Mortensen, Monica, *Defendant*

99.    Nangia, Geeta, *Dekker Witness*

100.    National Association of Pediatric Nurse Practitioners, *Amicus*

101.    Nelson, Melissa, *Former Defendant*

102.    Olson-Kennedy, Johanna, *Dekker Witness*

103.    Pages, Luz, *Defendant*

104.    Patel, Ami, *Counsel for Plaintiffs*

105.    Pediatric Endocrine Society, *Amicus*

106.    Peral, Stephanie, *Counsel for Plaintiffs*

107.    Percival, James, *Counsel for Defendants*

108.    Perko, Gary, *Counsel for Defendants*

109.    Pimentel, Eleonor, *Defendant*

110.    Poe, Patricia, *Plaintiff*

111.    Poe, Paul, *Plaintiff*

112.    Popkin, Kelly, *Counsel for Plaintiffs*

113.    Pratt, Joshua, *Counsel for Dekker Defendants*

114.    Pryor, Harold, *Former Defendant*

115.    Redburn, Thomas, Jr., *Counsel for Plaintiffs*

116.    Romanello, Nicholas, *Defendant*

117.    Fernandez-Rundle, Katherine, *Former Defendant*

118.    Schechter, Loren, *Dekker Witness*

*Jane Doe et al. v. Surgeon General, State of Florida et al.,*
No. 23-12159

119.  Scott, Sophie, *Dekker Witness*

120.  Shumer, Daniel, *Dekker Witness & Doe Declarant*

121.  Silverman, Lawrence, *Counsel for Plaintiffs*

122.  Societies for Pediatric Urology, *Amicus*

123.  Society for Adolescent Health and Medicine, *Amicus*

124.  Society for Pediatric Research, *Amicus*

125.  Society of Pediatric Nurses, *Amicus*

126.  Stafford, William, III, *Counsel for Defendants*

127.  Starr, Jason, *Counsel for Plaintiffs*

128.  Stoll, Christopher, *Counsel for Plaintiffs*

129.  Van Meter, Quentin, *Dekker Witness*

130.  Van Mol, Andre, *Dekker Witness*

131.  Veta, D. Jean, *Counsel for Amicus*

132.  Vila, Hector, *Defendant*

133.  Ward, Dennis, *Former Defendant*

134.  Wasylik, Michael, *Defendant*

135.  Weaver, Cynthia, *Counsel for Plaintiffs*

136.  Weida, Jason, *Dekker Defendant*

137.  Whitaker, Henry, *Counsel for Defendants*

138.  Williams, Gregory, *Defendant*

139.  World Professional Association for Transgender Health, *Amicus*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*,
No. 23-12159

140.   Worrell, Monique, *Former Defendant*

141.   Zachariah, Zachariah, *Defendant*

142.   Zanga, Joseph, *Dekker Witness*

Per Circuit Rule 26.1-2(c), Defendants-Appellants certify that the CIP contained

herein is complete.

Dated: September 6, 2023

<u>/s/ Mohammad O. Jazil</u>
Counsel for Defendants-Appellants
Florida Surgeon General, Florida Department of Health, Florida Board of Medicine and Individual Members, and Florida Board of Osteopathic Medicine and Individual Members

<u>/s/ Joseph E. Hart</u>
Joseph E. Hart
Counsel for Defendants-Appellants William Gladson, Florida Surgeon General, and Florida Department of Health

## STATEMENT REGARDING ORAL ARGUMENT

The State doesn't seek oral arguments in this appeal. The issues and precedent are straightforward; reversal is required.

# TABLE OF CONTENTS

Statement Regarding Oral Argument ........................................................ i

Table of Contents ................................................................................... ii

Table of Authorities ............................................................................... iv

Introduction .......................................................................................... 1

Jurisdictional Statement ......................................................................... 2

Statement of the Issues .......................................................................... 2

Statement of the Case ............................................................................ 3

    I. Background ...................................................................................... 3

    II. Factual History ............................................................................ 11

    III. Procedural History ...................................................................... 12

Standard of Review ............................................................................... 13

Summary of the Argument ..................................................................... 14

Argument ............................................................................................. 15

    I. The Merits Favor the State—Not Plaintiffs ........................................ 16

        A. The Equal Protection Clause Is Satisfied ................................... 16

        B. Substantive Due Process Is Satisfied ......................................... 24

        C. The District Court Decided to Make Medical Policy .............. 29

    II. Irreparable Harm Isn't Established ................................................... 32

    III. The Balance of Harms & the Public Interest Don't Favor Plaintiffs 33

Conclusion ............................................................................................ 33

Certificate of Compliance ........................................................................35

Certificate of Service ..............................................................................35

# TABLE OF AUTHORITIES

<u>Cases</u>

*Adams v. School Board of St. John's County,*
   57 F.4th 791 (11th Cir. 2022) ............................................................*passim*

*Bendiburg v. Dempsey,*
   909 F.2d 463 (11th Cir. 1990) ...................................................................28

*Case v. Ivey,*
   2022 WL 2441578 (11th Cir. July 5, 2022)...........................................25-28

*City of Cleburne v. Cleburne Living Center,*
   473 U.S. 432 (1985) ...................................................................................20

*Dekker v. Weida,*
   4:22-cv-325 (N.D. Fla. 2022) .............................................................*passim*

*Dobbs v. Jackson Women's Health Organization,*
   142 S. Ct. 2228 (2022) .......................................................................*passim*

*Doe v. Moore,*
   410 F.3d 1337 (11th Cir. 2005) ...........................................................25-26

*Eknes-Tucker v. Governor, of the State of Alabama,*
   22-11707 (11th Cir. Aug. 21, 2023) ...................................................*passim*

*FCC v. Beach Communications,*
   508 U.S. 307 (1993) .............................................................................23, 29

*Frontiero v. Richardson,*
   411 U.S. 677 (1973) ...................................................................................17

*FTC v. On Point Cap. Partners LLC,*
   17 F.4th 1066 (11th Cir. 2021) .................................................................14

*GBM v. Secretary of Alabama,*
   992 F.3d 1299 (11th Cir. 2021) .................................................................23

*Geduldig v. Aiello,*
 417 U.S. 484 (1974) ...................................................................... 21

*In re Subpoenas Served on AAP,*
 23-mc-00004 (D.D.C. 2023) ......................................................... 30

*In re Subpoenas Served on AAP,*
 23-7025 (D.C. Cir. 2023) .............................................................. 30

*In re WPATH,*
 23-11753 (11th Cir. July 30, 2023) .............................................. 30

*League of Women Voters of Florida, Inc. v. Florida Secretary of State,*
 32 F.4th 1363 (11th Cir. 2022) .................................................... 16

*League of Women Voters of Florida Inc. v. Florida Secretary of State,*
 66 F.4th 905 (11th Cir. 2023) ................................................16, 27

*L.W. v. Skrmetti,*
 73 F.4th 408 (6th Cir. 2023) ...............................................*passim*

*Maddox v. Stephens,*
 727 F.3d 1109 (11th Cir. 2013) .................................................. 28

*Martin v. Singletary,*
 965 F.2d 944 (11th Cir. 1992) .................................................... 15

*Maryland v. King,*
 567 U.S. 1301 (2012) .................................................................. 33

*Moore v. East Cleveland,*
 431 U.S. 494 (1977) ............................................................... 25-26

*Morrissey v. United States,*
 871 F.3d 1260 (11th Cir. 2017) .................................................. 25

*Northeastern Florida Chapter of Association of General Contractors v. Jacksonville,*
 896 F.2d 1283 (11th Cir. 1990) .................................................. 13

*Otto v. City of Bocan Raton,*
 981 F.3d 854 (11th Cir. 2020) .................................................... 32

v

*Parham v. J.R.,*
    442 U.S. 584 (1979) ......................................................................28

*Reno v. Flores,*
    507 U.S. 292 (1993) ..........................................................24-25, 27

*Swain v. Junior,*
    958 F.3d 1081 (11th Cir. 2020) ...................................................13

*Troxel v. Granville,*
    530 U.S. 57 (2000) ........................................................................28

*United States v. Carolene Products Co.,*
    304 U.S. 144 (1938) ......................................................................20

*\*Washington v. Glucksberg,*
    521 U.S. 702 (1997) .............................................................*passim*

Statutes

28 U.S.C. § 1292 ..................................................................................2

28 U.S.C. § 1331 ..................................................................................2

Other

Antonin Scalia & Bryan Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) ....................12

## **INTRODUCTION**

Just like the district court in *Eknes-Tucker v. Governor, of the State of Alabama*, No. 22-11707 (11th Cir. Aug. 21, 2023), the district court in this case effectively constitutionalized the World Professional Association for Transgender Health's standards of care and the Endocrine Society's clinical practice guidelines. And just like the district court in *Eknes-Tucker*, the district court in this case erred.

The State of Florida—not private advocacy groups—gets to regulate risky medical procedures. The Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), calls for deference to the State's choices. This Court's decision in *Adams v. School Board of St. John's County*, 57 F.4th 791 (11th Cir. 2022) (en banc), counsels that those choices be judged under the rational-basis test. And *Eknes-Tucker* is binding precedent that now slams the door shut on any argument that heightened scrutiny applies to the State of Florida's choices or that the guarantees of equal protection and due process have been violated.

Senate Bill 254, Florida Board of Medicine Rule 64B8-9.019, and Florida Board of Osteopathic Medicine Rule 64B15-14.014 are the Florida provisions at issue. They prevent minors from receiving puberty blockers and cross-sex hormones to treat a psychiatric condition called gender dysphoria. Among other things, low-quality evidence supports the use of these treatments, meaning that they might not work. These treatments also carry serious risks like bone-density loss, cognitive decline, and sterility.

1

The district court held that the Equal Protection Clause likely affords a right for minors to receive puberty blockers and cross-sex hormones to treat gender dysphoria, and that parents likely have a substantive-due-process right to obtain such treatments for their children. But the district court only reached that conclusion by sidestepping binding precedent available to it at the time, as later calcified by *Eknes-Tucker*. The district court also all but ignored the State's compelling governmental interest in protecting children from the harm that these treatments cause.

For these reasons, and the reasons that follow, this Court should reverse the district court's preliminary-injunction order.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 (federal-question jurisdiction). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) (jurisdiction to review a district court's "grant[]" of an "injunction[]"). The district court granted Plaintiffs' preliminary-injunction motion on June 6, 2023. Doc.90. A notice of appeal was timely filed on June 26, 2023. Doc.108.

## STATEMENT OF THE ISSUES

Plaintiffs challenged Senate Bill 254, Florida Board of Medicine Rule 64B8-9.019, and Florida Board of Osteopathic Medicine Rule 64B15-14.014 under the Fourteenth Amendment's Equal Protection Clause and the Fourteenth Amendment's substantive due process protections. Doc.30. As such, this Court must decide:

2

1.   Whether these health and welfare laws violate the Equal Protection Clause—that is, whether they are rationally related to legitimate governmental interests.

2.   Whether these health and welfare laws violate a parent's substantive due process rights—that is, whether there's a fundamental right, deeply rooted in the history and traditions of this nation, for parents to obtain puberty blockers and cross-sex hormones to treat their children's gender dysphoria.

Given the binding decision in *Eknes-Tucker*, the answer to both questions is an unequivocal no.

## STATEMENT OF THE CASE

### I.    Background

**A.** A word before proceeding. While this case was beginning in the district court, a similar case, *Dekker v. Weida*, 4:22-cv-325 (N.D. Fla. 2022), was ending in the district court. Both this case and *Dekker* shared similar issues regarding treatments for gender dysphoria, and both cases were before the same judge, had overlapping counsel, contained challenges to SB 254 provisions, and generally contained the same expert witness testimony. The parties in this case therefore agreed to use the record established in the *Dekker* trial during the instant preliminary-injunction proceedings.

In this brief, references to the *Dekker* docket are identified as "*Dekker* Doc.," references to *Dekker* trial exhibits are identified as "*Dekker* PX" (for Plaintiffs exhibits) or "*Dekker* DX" (for State exhibits), and references to the *Dekker* trial transcript are identified as "*Dekker* Tr.", with the transcript of the fourth day of the *Dekker* trial

3

identified as "*Dekker* Tr.*"[2] The *Dekker* preliminary-injunction hearing transcript is referred to as "*Dekker* P.I. Tr." The testimony of live witnesses during the preliminary injunction proceeding in *Dekker* became part of the trial record under Federal Rule of Civil Procedure 65(a)(2). That testimony included the perspective of a detransitioner—someone who decided to stop her gender transition—and a father whose transgender daughter continued suffering after receiving the treatments at issue and ultimately committed suicide. *Dekker* P.I. Tr.41, 50.

References to the instant record are just "Doc." or "Tr."

**B.** This case is about treatments for gender dysphoria. Gender dysphoria is a psychiatric diagnosis, the distressing incongruence between one's biological sex and one's gender identity. *Dekker* Tr.971:3-7 (Dr. Levine); *see also Dekker* Tr.38:17-20, 114:3-9 (Dr. Karasic). Sex is biologically based, but gender is increasingly understood to be based on culturally constructed attributes associated with being a biological male or a biological female. *See generally Dekker* Tr.971:15-25, 1099:18-25 (Dr. Levine); *Dekker* DX24 at 7. Gender identity, in turn, is understood as "a person's deeply felt, inherent sense of being a girl, woman, female, a boy, a man, or male." *Dekker* Tr.120:14-22 (Dr. Karasic). Unlike biological sex, gender identity isn't biologically based. *Dekker* Tr.971:15-972:2 (Dr. Levine). One's gender identity can change throughout one's life. *Dekker* Tr.165:18-23 (Dr. Karasic). So can transgender status; after all, detransitioners

---

[2] The page numbers for the fourth day's transcript do not pick up where the third day's transcript left off.

4

exist. *Dekker* Tr.81:23-82:14, 164:2-165:23 (Dr. Karasic); *Dekker* DX16 at 43; *Dekker* P.I. Tr.41:17 (testimony from a detransitioner).

As Plaintiffs' experts conceded during the *Dekker* trial, there isn't any "confirmatory laboratory or radiographic study for the diagnosis of gender dysphoria." *Dekker* Tr.400:7-14 (Dr. Antommaria). No "blood test," "X-ray," "MRI," "CT scan," "imaging of any kind," or "gene" can diagnose or establish the existence of gender dysphoria. *Dekker* Tr.114:15-115:4 (Dr. Karasic), 189:14-16 (Dr. Shumer). And while only transgender individuals suffer from gender dysphoria, not every transgender individual has gender dysphoria; some transgender individuals have no distressing incongruence between their gender identity and biological sex. *Dekker* Tr.115:5-119:22 (Dr. Karasic). In other words, someone can be transgender but not have gender dysphoria. *Id.*

It's hard to diagnose gender dysphoria for other reasons as well. Transgender individuals often suffer from other mental health issues, such as autism, anxiety, depression, and suicidality. *Dekker* Tr.108:11-111:11 (Dr. Karasic), 1053:4-1054:17 (Dr. Levine); *Dekker* DX16 at 173. Many factors can influence one's gender dysphoria as well, including environmental factors, such as social acceptance. *Dekker* Tr.136:16-137:5 (Dr. Karasic). Other conditions, such as body dysmorphic disorder, can also be confused with gender dysphoria. *Dekker* DX24 at 8.

At issue here are two treatments for the difficult-to-diagnose psychiatric condition of gender dysphoria: puberty blockers and cross-sex hormones. Puberty blockers, or GnRH agonists, suppress an adolescent's natural puberty. *Dekker* DX24 at 12-17.

5

Puberty blockers are then followed up with cross-sex hormones—testosterone for biological females and estrogen for biological males—which make an individual undergo the opposite sex's puberty. *Dekker* DX24 at 17-21. Around 98% of gender-dysphoric patients who take puberty blockers go on to receive cross-sex hormones. *Dekker* Tr.578:14-20 (Dr. Olson-Kennedy); *see also Dekker* Tr.262:14-22 (Dr. Shumer).

These treatments come with significant health risks. Puberty blockers can cause bone-mineralization issues, compromise fertility (if puberty blockers are followed with cross-sex hormones), and have unknown effects on brain development. *Dekker* DX24 at 14. Cross-sex hormones could cause infertility. *Dekker* DX24 at 18. To be sure, these treatments aren't unique to gender dysphoria. Puberty blockers, for example, have been used to treat precocious puberty in minors, though the goal there is to restore endocrine levels to a normal range, not to stop a natural and age-appropriate release of hormones. Doc.90 at 10.

**C.** Two advocacy organizations are the primary proponents for these gender-dysphoria treatments. The first is the World Professional Association for Transgender Health. It publishes what it calls "standards of care" on treatments for gender dysphoria. *Dekker* DX16. The drafters of these so-called standards of care must be WPATH full members with a marked commitment to furthering transgender rights, *Dekker* Tr.100:18-101:5 (Dr. Karasic); *Dekker* DX17, and they need not be medical professionals; being a parent of a transgender child suffices. *Dekker* Tr.*100:16-21 (Dr. Janssen); *Dekker* DX16 at 250.

6

WPATH is upfront with the kinds of evidence that support its treatment recommendations. Consider the following admissions:

- In the adolescent-treatment chapter: "[g]ender-diverse youth should fully understand the reversible, partially reversible, and irreversible aspects of a treatment, *as well as the limits of what is known about certain treatments (e.g., the impact of pubertal suppression on brain development[)].*" *Dekker* DX16 at 63 (emphasis added).
- In the adolescent-treatment chapter: "[t]here is, however, limited data on the optimal timing of gender-affirming interventions as well as the long-term physical, psychological, and neurodevelopmental outcomes in youth." *Dekker* DX16 at 67.
- In the adolescent-treatment chapter: "[t]he potential neurodevelopmental impact of extended pubertal suppression in gender diverse youth has been specifically identified as an area in need of continued study." *Dekker* DX16 at 67.
- In the adult-assessment chapter: the "empirical evidence base for the assessment of" transgender and gender diverse adults "is limited." *Dekker* DX16 at 34-35.
- In the adult-assessment chapter: the "intervention-specific risks associated with the presence of specific physical conditions have not been well researched." *Dekker* DX16 at 40.
- In the hormone-therapy chapter: "[t]here are also major gaps in knowledge regarding the potential effects of testosterone on oocytes and subsequent fertility of" "patients." *Dekker* DX16 at 120.

The second organization is the Endocrine Society. It publishes clinical practice guidelines on gender-dysphoria treatments, which WPATH co-sponsors, with several WPATH members serving as contributors to the guidelines. *Dekker* DX24 at 1, *Dekker* Tr.124:11-125:8 (Dr. Karasic). The guidelines themselves use the Grading of Recommendations Assessment, Development, and Evaluation or GRADE evidence-rating system. *Dekker* DX24 at 1, 4-5. GRADE rates the evidence quality for a treatment recommendation: evidence is either high, moderate, low, or very-low quality. *Dekker* DX24

at 4-5. With higher-quality evidence comes more confidence that treatments will produce the intended result. *Dekker* Tr.346:4-14 (Dr. Antommaria); *Dekker* DX24 at 4-5. With low-quality evidence, or even very-low-quality evidence, such confidence is either limited or little. *Dekker* Tr.396:21-397:10 (Dr. Antommaria); *Dekker* DX24 at 4-5.

The Endocrine Society's clinical practice guidelines put forth twenty-eight recommendations on gender-dysphoria treatments. *Dekker* DX24 at 2-4. Three are backed by moderate-quality evidence, fourteen are backed by low-quality evidence, five are backed by very-low-quality evidence, and six are backed by no evidence at all. *Dekker* DX24 at 2-5. For example:

- Low-quality evidence backs the following: "[w]e suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty." *Dekker* DX24 at 3.
- Very-low-quality evidence backs the recommendation that "there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years," "*even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years.*" *Dekker* DX24 at 3 (emphasis added).
- The recommendation that "clinicians approve genital gender-affirming surgery only after completion of at least 1 year of consistent and compliant hormone treatment" is backed by no evidence at all. *Dekker* DX24 at 4.

Even beyond WPATH's standards of care and the Endocrine Society's clinical practice guidelines, gender-dysphoria treatments are backed by limited data and studies. The *Dekker* Plaintiffs' experts concede as much:

- "Limited prospective outcome data exist regarding transgender and nonbinary youth receiving gender-affirming hormones." *Dekker* Tr.586:18-23 (Dr. Olson-Kennedy).
- "Evidence has been lacking from longitudinal studies that explore potential mechanisms by which gender-affirming medical care affects gender dysphoria and subsequent well-being." *Dekker* Tr.586:24-587:5 (Dr. Olson-Kennedy).
- "There are no large-scale studies examining mental health among transgender and nonbinary youth who receive gender-affirming hormone therapy." *Dekker* Tr.588:14-589:4 (Dr. Olson-Kennedy).
- "Knowledge about the effects of puberty suppression on the developing brain of transgender youth is limited." *Dekker* Tr.*38:16-19 (Dr. Edmiston).

The studies relied on by Plaintiffs are also exceedingly weak, often backed by online-survey data, *Dekker* Tr.589:8-19 (Dr. Olson-Kennedy), small sample sizes, *Dekker* Tr.*37:11-39:7 (Dr. Edmiston), a lack of long-term data, *Dekker* Tr.*37:11-39:7 (Dr. Edmiston), and a lack of randomized-sampling data, *Dekker* Tr.143:13-15, 146:3-147:18 (Dr. Karasic) (discussing whether high-quality, randomized gender-dysphoria studies are feasible).

**D.** States aren't alone in worrying about gender-dysphoria treatments. Other countries share their concern:

**Sweden:** Sweden's National Board of Health and Welfare determined that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments," and determined that "[t]reatment with GnRH analogues, gender-affirming hormones, and mastectomy can be administered" only "*in exceptional cases.*" *Dekker* DX8 at 3 (emphasis added).

**Finland:** Finland's Council for Choices in Healthcare urged extreme caution when providing gender transitioning services to children. It says that "[t]he reliability of the existing studies with no control groups is highly uncertain, and because of this uncertainty, no decisions should be made that can permanently alter a still-maturing minor's mental and physical development." *Dekker* DX9 at 7.

**United Kingdom:** The U.K. National Institute of Health and Care Excellence reviewed studies that purport to support hormone therapy for gender-dysphoric minors. *Dekker* DX11, *Dekker* DX12. The institute concluded that "all small, uncontrolled observational studies" for puberty blockers "are of very low certainty using modified GRADE" and the studies "reported physical and mental health comorbidities and concomitant treatments very poorly." *Dekker* DX11 at 13. As for cross-sex hormones, the institute stated that evidence of their effectiveness was also of a "very low" quality. *Dekker* DX12 at 4. The U.K.'s Cass Report, which reviewed gender-identity services in the country, stated that there's a "lack of consensus" and open discussion about the nature of gender dysphoria and therefore about the appropriate clinical response. *Dekker* DX10 at 16.

**France:** France's Académie Nationale de Médecine concludes that "great medical caution" must be taken "given the vulnerability, particularly psychological, of this population [of younger people presenting with gender dysphoria] and the many undesirable effects, and even serious complications, that some of the available therapies can cause." *Dekker* DX13 at 1.

10

**Australia & New Zealand:** The Royal Australian and New Zealand College of Psychiatrists has said that there's a "paucity of evidence" on the outcomes of those presenting with gender dysphoria. *Dekker* DX14 at 1.

## II.  Factual History

Against this backdrop, in 2022, the Florida Board of Medicine and the Florida Board of Osteopathic Medicine initiated rulemaking to create standards of practice for treating gender dysphoria in minors. After conducting several hearings, the boards promulgated rules that contained the same language:

> (1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
> > (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
> > (b) Puberty blocking, hormone, and hormone antagonist therapies.
> (2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

Rule 64B8-9.019, Fla. Admin. Code; Rule 64B15-14.014, Fla. Admin. Code. The Board of Medicine's rule went into effect on March 16, 2023, and the Board of Osteopathic Medicine's rule went into effect on March 28, 2023.

Not long afterward, the Florida Legislature passed, and the Governor of Florida signed into law, SB 254. In relevant part, SB 254 "prohibit[s] for patients younger than 18 years of age" "sex-reassignment prescriptions and procedures," which it defines as:

> (1) The prescription or administration of puberty blockers for the purpose of attempting to stop or delay normal puberty in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex . . . .

11

> (2) The prescription or administration of hormones or hormone antago-
> nists to affirm a person's perception of his or her sex if that perception is
> inconsistent with the person's sex . . . .

Ch. 2023-90, §§ 4-5, at 2-3, Laws of Fla. Though the statutory text does not explicitly mention "gender dysphoria," the text includes "what is implicit." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 96 (2012). And what's implicit is the diagnosis of gender dysphoria, which some advocate the use of puberty blockers and cross-sex hormones as treatment. Ch. 2023-90, §§ 4-5, at 2-5, Laws of Fla.

Under the bill, those already on puberty blockers and cross-sex hormones may continue with those treatments with informed consent. *Id.* § 5, at 3-5. The bill also imposes civil liability, criminal liability, and professional consequences for rendering such treatment to minors. *Id.* §§ 5-7, at 3-6.

## III.   Procedural History

Plaintiffs originally challenged the two board rules. Doc.1. But after SB 254's enactment, Plaintiffs amended their complaint and challenged the bill as well. Doc.59. Plaintiffs moved for a preliminary injunction, arguing that the laws (1) violated the Equal Protection Clause for sex-based and transgender-status-based discrimination, and (2) violated a substantive due process right for parents to direct the upbringing of their children. Doc.30.

On May 19, 2023, the district court held a hearing on the preliminary-injunction arguments. Doc.63. The court noted that Plaintiffs didn't file any of their medical records and indicated that they probably should do so. *E.g.*, Tr.21:19-21, Tr.45:11-49:19.

12

Plaintiffs filed them weeks later. Doc.86. But Plaintiffs did so without securing a confidentiality agreement with the State. The court thus considered medical records that the State didn't—and until the first week of August, hadn't—received or reviewed.

The district court nonetheless sided with Plaintiffs and granted their preliminary-injunction motion. Doc.90. It held that the challenged laws likely violate the Equal Protection Clause due to sex-based and transgender-status-based discrimination, and that the challenged laws likely violate a parental right to direct the upbringing of their children. The court also found that Plaintiffs would be irreparably harmed absent an injunction, that the State wouldn't be harmed by the injunction, and that the public interest favors an injunction.

## <u>STANDARD OF REVIEW</u>

A preliminary injunction is "an extraordinary and drastic remedy," a "powerful exercise of judicial authority in advance of trial." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) (cleaned up). It can only be granted when a plaintiff carries his burden of establishing that (1) he has a substantial likelihood that he will prevail on the merits, (2) he will suffer from irreparable harm absent an injunction, (3) his threatened injury outweighs any harm to the defendant, and (4) the public interest favors an injunction. *Id.* at 1284-85. The first two factors are the most important, and when the State is the nonmoving party, the last two factors merge. *Swain v. Junior*, 958 F.3d 1081, 1088, 1091 (11th Cir. 2020).

13

This Court reviews the grant of a preliminary injunction for abuse of discretion, reviewing the underlying legal conclusions de novo and factual findings for clear error. *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1077-78 (11th Cir. 2021).

## SUMMARY OF THE ARGUMENT

This Court recently agreed with the State's analysis in *Eknes-Tucker v. Governor, of the State of Alabama*, 22-11707 (11th Cir. Aug. 21, 2023), a virtually identical case with a virtually identical law in the exact same procedural posture. Although the district court didn't have the benefit of reviewing that case, it controls. *Eknes-Tucker* makes clear that the district court should have applied the rational-basis test and concluded that the State of Florida—not Plaintiffs—was likely to succeed on the equal protection and substantive due process claims.

Even without *Eknes-Tucker*, the district court still overlooked binding U.S. Supreme Court and Eleventh Circuit precedent. Regarding likelihood of success, the district court's analysis completely omitted any mention of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), and *Washington v. Glucksberg*, 521 U.S. 702 (1997), and any meaningful discussion (beyond a handful of citation sentences) of *Adams v. School Board of St. John's County*, 57 F.4th 791 (11th Cir. 2022) (en banc).

Those cases make all the difference. For equal protection, *Dobbs* holds that health and welfare regulations undergo rational basis, not heightened scrutiny. That's true, even if the regulation only touches one particular group of people. *Adams* adds that sex-based discrimination is discrimination based on biological sex, and *Adams* declined to

14

hold that transgender status is a quasi-suspect classification that's afforded heightened constitutional scrutiny. For substantive due process, *Glucksberg* requires a fundamental right to be narrowly and precisely described, and to be deeply rooted in the history and traditions of the nation. Simply advancing a novel, abstract right isn't enough.

The district court also failed to consider certain critical information relevant to the remaining preliminary-injunction factors. Plaintiffs failed to establish irreparable harm; the court simply accepted their (ex parte) medical records without much substantive analysis. And for the balance-of-harms and public-interest factors, the court didn't consider that the State is harmed when it isn't allowed to enforce its laws, especially when the laws protect minors. The State of Florida has a compelling governmental interest in protecting minors, another fact omitted in the court's order.

Given these omissions, the district court's grant of a preliminary injunction should be reversed.

## **ARGUMENT**

None of the preliminary-injunction factors are satisfied. On the likelihood for success prong, *Eknes-Tucker* controls. *See Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992). It keeps Plaintiffs from succeeding on the merits. *Dobbs*, *Adams*, and *Glucksberg* do too. The remaining preliminary-injunction factors also tilt decidedly in the State of Florida's favor because, in the end, the State passed reasonable laws that protect minors from risky medical care.

15

## I.    The Merits Favor the State—Not Plaintiffs.

Plaintiffs' equal-protection and substantive-due-process challenges fail. Binding precedent warrants reversal of the district court's contrary conclusions.

### A.    The Equal Protection Clause Is Satisfied.

The district court's constitutional analysis suffered from three errors. First, it didn't provide the State with a presumption of good faith and didn't give the challenged laws any presumption of validity. Second, the district court wrongly subjected the laws to heightened review, instead of rational basis review. Third, the district court's pretext analysis is legally deficient.

**1.** It's blackletter law that State "health and welfare laws" are "entitled to a strong presumption of validity" and "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Dobbs*, 142 S. Ct. at 2284 (quotation marks omitted). Regulations on gender-dysphoria treatments are health and welfare laws. *Eknes-Tucker*, slip op. at 40-41. The laws are also entitled to a presumption of good faith. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023). It's error not to afford that presumption. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373-74 (11th Cir. 2022) (per curiam) (stay panel).

Here, the district court afforded no presumption of validity or presumption of good faith. When evaluating the State's governmental interests—preventing citizens from receiving low-quality-backed treatments with serious medical consequences, to

name a few—the district court didn't defer to the State; instead, the district court made its own policy judgments based on WPATH and the Endocrine Society's perspective as the benchmark. Doc.90 at 7-9. The State's work was presumed to be invalid because it did not conform to WPATH and the Endocrine Society's perspective.

The district court also assumed bad faith whenever it could. For example, the district court stated that the challenged laws "were motivated in substantial part by the plainly illegitimate purposes of disapproving transgender status and discouraging individuals from pursuing their honest gender identities," Doc.90 at 26, though the record includes scant evidence of any such disapproval. *See infra*.

**2.** *Eknes-Tucker* further confirms that the district court erred in concluding that the challenged laws are subject to heightened sex-based scrutiny. *Eknes-Tucker*, slip op. at 35-36. The Equal Protection Clause affords heightened scrutiny to laws that make distinctions based on immutable characteristics like race, ethnicity, or national origin. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.). Biological sex triggers heightened scrutiny because it too is an immutable characteristic. *Adams*, 57 F.4th at 807-08. But biological sex isn't the same as gender identity or transgender status; gender identity and transgender status are mutable characteristics as this Court and Plaintiffs' experts have recognized. *Adams*, 57 F.4th at 807-08; *Dekker* Tr.165:18-23 (Dr. Karasic); *see also Dekker* Tr.81:23-82:14, 164:2-165:17 (Dr. Karasic). So the challenged laws cannot be subject to heightened scrutiny based on some immutable characteristic theory. Nor

do the challenged laws actually discriminate based on sex. The relevant distinction is one based on a diagnosis for gender dysphoria.

The district court disagreed. Doc.90 at 20. The court reasoned that "[i]f one must know the sex of a person to know whether or how a provision applies to the person," then "the provision draws a line based on sex." Doc.90 at 19. The court went on to offer the following example:

> Consider an adolescent, perhaps age 16, that a physician wishes to treat with testosterone. Under the challenged [laws], is the treatment legal or illegal? To know the answer, one must know the adolescent's sex. If the adolescent is a natal male, the treatment is legal. If the adolescent is a natal female, the treatment is illegal. This is a line drawn on the basis of sex, plain and simple.

Doc.90 at 19-20. From this, the court concluded "that the reason for the treatment—the diagnosis—is different for the natal male and natal female. . . . But this does not change the fact that this is differential treatment based on sex." Doc.90 at 20.

The district court erred badly. Start with the statement that a "provision draws a line based on sex" if "one must know the sex of a person to know whether or how a provision applies to the person." Doc.90 at 19. That's simply not so. Otherwise, abortion regulations would be subjected to heightened scrutiny. After all, only biological females can become pregnant and can undergo an abortion. But the Supreme Court held that rational basis applies, not heightened scrutiny. *Dobbs*, 142 S. Ct. at 2284.

Next, consider the basis for the distinction actually made under Florida law: a psychiatric diagnosis of gender dysphoria. Both biological males and biological females

can be diagnosed with it. *Eknes-Tucker*, slip op. at 41. The challenged laws apply to both biological sexes, thereby precluding any claim of sex-based discrimination. *Id.* at 42. *Cf. Adams*, 57 F.4th at 810 (the challenged bathroom policy divided students based on biological sex, thereby subjecting it to heightened scrutiny).

More specifically, consider the use of puberty blockers. Under the challenged laws, neither a biological male nor a biological female can obtain them to treat gender dysphoria. There's no sex-based discrimination; it applies equally to both sexes.

The same is true with cross-sex hormones. Neither a biological male nor a biological female can obtain them to treat gender dysphoria. *Eknes-Tucker*, slip op. at 42; *L.W. v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) (stay panel).

Again, the district court tried to get around the diagnosis-based distinction by saying that to know whether providing testosterone is legal, "one must know the adolescent's sex. If the adolescent is a natal male, the treatment is legal. If the adolescent is a natal female, the treatment is illegal." Doc.90 at 19-20. That's not right.

Under Florida law, the natal female remains free to receive testosterone so long as it's not to treat the incongruence between her biological sex and her perception of herself—so long as it's not to treat gender dysphoria. The diagnosis is what matters. It makes no difference that biological males can't obtain estrogen injections to treat gender dysphoria, and biological females can't obtain testosterone injections to treat gender dysphoria. "The reality that the" hormones "correspond to sex in these understandable

19

ways and that" the State "regulates them does not require skeptical scrutiny." *L.W.*, 73 F.4th at 419; *see also Eknes-Tucker*, slip op. at 42.

**3.** The district court also held that, in addition to sex-based discrimination, the challenged laws discriminate based on transgender status and are thus subject to heightened scrutiny. Doc.90 at 20-22. The court explained its reasoning as follows:

> [C]onsider a child that a physician wishes to treat with GnRH agonists to delay the onset of puberty. Is the treatment legal or illegal? To know the answer, one must know whether the child is [non-transgender] or transgender. The treatment is legal if the child is [non-transgender] but illegal if the child is transgender, because the [challenged laws] prohibit[] GnRH agonists only for transgender children, not for anyone else. The theoretical but remote-to-the-point-of-nonexistent possibility that a child will be identified as transgender before needing GnRH agonists for the treatment of central precocious puberty does not change the essential nature of the distinction.

Doc.90 at 21. The district court then used *United States v. Carolene Products Co.*, 304 U.S. 144 (1938), and *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), to hold that transgender status is a quasi-suspect class entitled to greater protections. Doc.90 at 21-22. In particular, the district court likened racial discrimination to discrimination on the basis of transgender status and concluded (without any factual basis or record citations) that transgender individuals lack political access and suffer from "widespread private opprobrium." Doc.90 at 22.

This Court effectively foreclosed the district court's conclusion when it said the following in two recent cases: "we have grave 'doubt' that transgender persons constitute a quasi-suspect class." *Eknes-Tucker*, slip op. at 46 (quoting *Adams*, 57 F.4th at 803

n.5). This Court even cited *City of Cleburne* to reach that conclusion. *Adams*, 57 F.4th at 803 n.5. This Court went on to say that "the regulation of a course of treatment that, by the nature of things, only transgender individuals would want to undergo would not trigger heightened scrutiny unless the regulation is a pretext for invidious discrimination against such individuals." *Eknes-Tucker*, slip op. at 46.

More fundamentally, the district court ignored that the challenged laws make a distinction based on a diagnosis, not transgender status. It bears emphasis that not every transgender individual suffers from gender dysphoria. *Dekker* Tr.115:5-119:22 (Dr. Karasic). And, under the challenged Florida provisions, both transgender and non-transgender individuals *can* obtain puberty blockers and cross-sex hormones, just not to treat gender dysphoria. Just as in *Geduldig v. Aiello* where "men and women were treated the same," because "nobody had health coverage for pregnancy," Doc.90 at 24 (referencing *Geduldig v. Aiello*, 417 U.S. 484 (1974)), here too non-transgender and transgender individuals are treated the same because nobody can obtain puberty blockers and cross-sex hormones to treat gender dysphoria.

The district court's puberty blockers example is unavailing as well. In fact, the court acknowledged the fatal flaw in its own argument: a transgender individual could obtain puberty blockers to treat his precocious puberty under the challenged laws. Implicit here is a recognition that the challenged laws turn on the diagnosis, not transgender status. The court attempted to minimize this scenario by calling it a "theoretical" and "remote-to-the-point-of-nonexistent possibility," citing no record evidence

in the process. Doc.90 at 21. The fact remains, though, that the challenged laws don't turn on transgender status.

Nor do *Carolene Products* and *City of Cleburne* elevate transgender status to a protected status. The district court is wrong that racial discrimination is like transgender discrimination. To reiterate, the Equal Protection Clause provides greater protections for immutable characteristics. *Adams*, 57 F.4th at 807-08. Race is immutable. Biological sex is also immutable. Transgender status isn't. Even the experts admit this; detransitioners exist, after all. *Dekker* Tr.81:23-82:14, 164:2-165:17 (Dr. Karasic); *Dekker* P.I. Tr.41:17-45:6.

The district court also failed to cite any factual bases to support its conclusion that transgender individuals lack political access and suffer from "widespread private opprobrium." Doc.90 at 22. The *Dekker* record, in fact, belies this conclusion. The federal government provides wide protections for transgender individuals. *E.g.*, *Dekker* DX1, *Dekker* DX2, *Dekker* DX3. Plaintiffs' insurance expert further testified that a substantial amount of private and governmental insurers cover treatments for gender dysphoria. *Dekker* Tr.475:3-482:4 (Dr. Baker). And many medical organizations support this community. Doc.90 at 32-33. So it is difficult, based on this record, to say that transgender individuals suffer widespread private opprobrium.

**4.** The pretext-based theory for heightened scrutiny fails too. The district court's contrary holding marshalled only a Florida Department of Health fact sheet that states, in part, that minors shouldn't socially transition. Doc.90 at 26. Later, in a different

section of its order, the court mentioned some statements from one member of the Florida House. Doc.90 at 33.

A fact sheet or even one legislator's statements can't speak for all members of the Florida House, the Florida Senate, the Governor, the Department of Health, the Board of Medicine, and the Board of Osteopathic Medicine. This kind of evidence is insufficient to satisfy the *Arlington Heights* test for invidious discrimination. *See League of Women Voters*, 66 F.4th at 932 (holding that a statement from one legislator isn't dispositive of discriminatory intent).

Even if the district court considered the *Arlington Height* factors, they wouldn't support a showing of pretextual discrimination. Putting the board rules aside, Plaintiffs didn't introduce, and the district court never considered, any *Arlington Heights* evidence related to SB 254. The bill was passed while the preliminary-injunction motion was pending, and Plaintiffs didn't introduce any bill-specific evidence, such as the sequence of events leading up to its passage, its procedural departures, or its substantive departures. *See generally GBM v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). That evidence would be introduced for the first time on appeal.

All told, there's no evidence of pretext.

**5.** Rational basis thus applies. Under this level of review, the law is entitled to a *strong* presumption of validity. *FCC v. Beach Comm'ns*, 508 U.S. 307, 314-15 (1993). The State need not "articulate its reasons for enacting" the law; instead, the law can be based on "rational speculation unsupported by evidence or empirical data." *Id.* at 315. Those

"attacking the rationality of the" challenged law have "the burden to negative *every* conceivable basis which might support it." *Id.* (emphasis added).

Rational basis is easily satisfied. *Eknes-Tucker*, slip op. at 35-37. The challenged laws turn on a medical diagnosis, not sex and not transgender status. The State has a compelling governmental interest in protecting its citizens from risky medical procedures for the treatment of a difficult-to-diagnose condition where there is "uncertainty regarding benefits" of the treatments, serious "irreversible effects" from the treatment like sterility, and a host of unknowns like the effects on cognition. *Eknes-Tucker*, slip op. at 35-36.

## B.    Substantive Due Process Is Satisfied.

Like its equal protection analysis, the district court's substantive due process analysis is foreclosed by this Court's decision in *Eknes-Tucker*. It's easy to see why. The district court's seven-sentence substantive-due-process analysis contains two major flaws. First, it never mentions *Washington v. Glucksberg* or applies its test for substantive-due-process claims. And second, the district court incorrectly decided that it, and not the State, gets to determine what treatments are good enough for Floridians. *Eknes-Tucker*, slip op. at 26-27.

**1.** Under *Glucksberg*, a "substantive-due-process analysis has two primary features." 521 U.S. 720-21. The first feature is a careful and precise description of the asserted fundamental right. *See Reno v. Flores*, 507 U.S. 292, 302 (1993) (courts must craft a "careful description of the asserted right"). The second feature is that the right must

24

be "'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720-21 (quoting *Moore v. E. Cleveland*, 431 U.S. 494, 502 (1977) (plurality op.)).

*First*, an asserted right's careful and precise description. The asserted right must be "narrowly frame[d]" to "the specific facts" of the case. *Doe v. Moore*, 410 F.3d 1337, 1344 & n.4 (11th Cir. 2005). It shouldn't be abstracted. *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017). When a party abstracts a right, courts intervene and properly prescribe the asserted right. Case law abounds with examples:

- In *Reno v. Flores*, an immigration case, the asserted right *wasn't* a right to be free from bodily restraint *or* a right of a "child to be released from all other custody into the custody of its parents, legal guardians, or even close relatives." Instead, the asserted right was a "right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government selected child-care institution." 507 U.S. at 302.

- In *Morrisey v. United States*, the asserted right *wasn't* the right to procreate. Instead, the asserted right was "whether a man has a fundamental right to procreate via an [in-vitro-fertilization] process that necessarily entails the participation of an unrelated third-party egg donor and a gestational surrogate." 871 F.3d at 1269.

- In *Doe v. Moore*, the asserted right *wasn't* a right to family association, a right to be free from threats, a right to be free of interference with religious practices, *or* a right to find or keep employment. Instead, the asserted right was a "right of a person, convicted of 'sexual offenses,' to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website." 410 F.3d at 1343-44.

- In *Case v. Ivey*, the asserted right *wasn't* a right to "direct the upbringing of" "children." Instead, the asserted right was a right of parents "to dress their children and what kind of medical care to provide

them in the specific context of a [COVID] mask mandate." 2022
WL 2441578, at *8 (11th Cir. July 5, 2022) (per curiam).

*Second*, an asserted right's deep rootedness. An asserted right must be "'deeply

rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720-21 (quoting

*Moore*, 431 U.S. at 502). Courts look to whether common law, early state legislatures,

and historical court cases recognized the right. *See, e.g.*, *Dobbs*, 142 S. Ct. at 2248-56

(demonstrating that a right to abortion isn't deeply rooted in the nation's history and

traditions); *Glucksberg*, 521 U.S. at 710 (same for a right to physician-assisted suicide).

That way, courts don't "deduce[]" rights "from abstract concepts," like "personal au-

tonomy" or privacy. *Glucksberg*, 521 U.S. at 725; *see also id.* at 727 ("That many of the

rights and liberties protected by the Due Process Clause sound in personal autonomy

does not warrant the sweeping conclusion that any and all important, intimate, and

personal decisions are so protected.").

**2.** Here, Plaintiffs asserted that parents have a fundamental right to control their

children's medical treatment; the district court accepted that right. Doc.90 at 27. But

that asserted right is far too abstract under *Glucksberg*. Instead, the asserted right must

be "narrowly frame[d]" to "the specific facts" of this case. *Moore*, 410 F.3d at 1337, 1344

& n.4. A more appropriate description of the asserted right is a parental right to obtain

puberty blockers and cross-sex hormones for their children to treat their gender dys-

phoria. As the above bullet-pointed examples show, the asserted right must be nar-

rowed to this precise description. That's why, for example, in *Case v. Ivey*, this Court

didn't accept a generalized "right to direct the upbringing of" children. 2022 WL 2441578, at *8. This Court narrowed that right. *Id.*

Nor did Plaintiffs and the district court cite *any* evidence—none whatsoever—to demonstrate the deep rootedness of a parental right to obtain puberty blockers and cross-sex hormones to treat their children's gender dysphoria. Doc.90 at 27. No statutes, no common-law cases, nothing was assembled to demonstrate this.

To reiterate, this Court recently confirmed in *Eknes-Tucker* that "the use of" puberty blockers and cross-sex hormones to treat gender dysphoria "almost certainly is not 'deeply rooted' in our nation's history and tradition." *Eknes-Tucker*, slip op. at 26-28 (marching through the history of such treatments). It's a "novel[]" right that can't "be considered so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Flores*, 507 U.S. at 303 (cleaned up). Substantive due process protections thus cannot be triggered.

**3.** The district court instead recognized a protected right because it believed that the treatments at issue are beneficial and adequate. Doc.90 at 27. But the district court failed to acknowledge that the State gets to make decisions about the appropriateness of medical treatments. *Dobbs*, 142 S. Ct. at 2283-84. The district court thus erred in "substitut[ing its] social and" medical "beliefs for the judgment of legislative bodies" and executive bodies. *Id.* (cleaned up). That's true "even when the laws at issue concern matters of great social significance and moral substance." *Id.*

**4.** The district court's citations of *Troxel v. Granville*, 530 U.S. 57 (2000), *Parham v. J.R.*, 442 U.S. 584 (1979), *Maddox v. Stephens*, 727 F.3d 1109 (11th Cir. 2013), and *Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990), are unavailing. *Troxel* was about visitation rights, not about regulations for risky medical treatments. 530 U.S. at 60; *see also Case*, 2022 WL 2441578, at *8 (rejecting a broad parental rights claim under *Troxel*). *Maddox* was similar; it was a custody and care case. 727 F.3d at 1113.

*Parham* actually helps the State: the Supreme Court held that a "state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." 442 U.S. at 603, 621 (holding that "it was error to hold unconstitutional the State's procedures for admitting a child for treatment to a state mental hospital"). Same with *Bendiburg*: the "state has an interest in protecting the health, safety, and welfare of children residing within its borders. Parental autonomy may be limited when parental decisions jeopardize the health or safety of a child, and the state can intercede on the child's behalf." 909 F.2d at 468, 470 (rejecting the parental substantive-due-process claim).

Therefore, the district court's cited cases either undercut or, at the very least, don't help its substantive-due-process conclusion. And this Court has already done the hard work and concluded that the district court got it wrong. *Eknes-Tucker*, slip op. 28-33 (distinguishing these cases).

28

## C.    The District Court Decided to Make Medical Policy.

The district court's conclusion that the challenged laws are "largely pretextual and, in any event, do not call for a different result," underscores another problem with its analysis. Doc.90 at 27. The court put the burden on the State to satisfy rational-basis review and didn't require the Plaintiffs to "negative" every plausible justification for the challenged laws. *Beach Comm'ns*, 508 U.S. at 315.

The through line of the district court's analysis is that it can make better medical policies and better weigh policy risks than the State medical boards and elected representatives. Consider the following concerning medical organizations, international views, and State interests:

*Bias in Medical Organizations.* The district court stated that transgender care is a "politically fraught area" and that, sometimes, WPATH members can get carried away. Doc.90 at 32-33. Even so, the district court concluded that "it is fanciful to believe that all the many medical associations who have endorsed gender-affirming care" "have so readily sold their patients down the river." Doc.90 at 34.

But in a "politically fraught area," the district court decided to take the issue outside of the political arena. When elected representatives take actions that constituents don't like, they can be voted out of office. And governments are subject to judicial review and disclosure laws. Medical organizations aren't accountable to anyone. Yet they have forced themselves into the political debate and have shielded themselves from *any* investigation of how they established their policies on gender-dysphoria treatments.

It's led to litigation before the D.C. Circuit and even this Court. *In re Subpoenas Served on AAP*, 23-mc-00004 (D.D.C. 2023); 23-7025 (D.C. Cir. 2023); *In re WPATH*, 23-11753 (11th Cir. July 30, 2023). The district court may trust medical organizations, but there's absolutely no record evidence to back that up—especially when the State tried, but was thwarted, to get that information. That's wrong. *L.W.*, 73 F.4th at 415 ("Life-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy by construing a largely unamendable federal constitution to occupy the field.").

*International Views.* The district court also found that Florida wasn't like Finland, Sweden, the U.K., France, Australia, and New Zealand, because these countries, unlike the State, don't ban puberty blockers and cross-sex hormones to treat gender dysphoria in children. Doc.90 at 35.

That's a false statement. Both SB 254 and the board rules contain a grandfather provision for the continuation of care before the laws went into effect. Still, the district court missed the point. Some of these countries pioneered treatments for gender dysphoria. But now, they are increasingly urging more and more caution.

True, these countries don't outrightly prohibit puberty blockers and cross-sex hormones to treat gender dysphoria. But they are more like the State—urging caution and care—than the seemingly treatment-on-demand model that Plaintiffs seek.

*Other State Interests.* The district court even acknowledged that treatments for gender dysphoria are backed by low-quality evidence. Doc.90 at 27-30. Still, it stated that

only about 13.5% of all medical treatments are supported by "high quality evidence" and that:

> We put band-aids on cuts to keep dirt out not because there is "high" quality research-generated evidence supporting the practice but because we know, from clinical experience, that cuts come with a risk of infection and band-aids can reduce the risk.

Doc.90 at 29. But injecting minors with puberty blockers, testosterone, and estrogen comes with significantly different risks than the band aid example. Not wearing a band aid may cause an infection, but taking testosterone could lead to permanent sterility.

Indeed, the district court recognized that "[g]ender dysphoria is far more complicated, and one cannot know, with the same level of confidence, how to treat it." Doc.90 at 29. And it said that there "are legitimate concerns about fertility and sexuality that a child entering puberty is not well-equipped to evaluate and for which parents may be less-than-perfect decisionmakers," as well as risks for "misdiagnosis" and "decrease[s] in IQ." Doc.90 at 30-31.

True, *some* medical professionals insist on puberty blockers and cross-sex hormones to treat gender dysphoria. But some don't. When there's a policy divide or doubt about medical risks, the State gets to draw the policy line. *Dobbs*, 142 S. Ct. at 2284; *Eknes-Tucker*, slip op. at 35-36; *L.W.*, 73 F.4th at 416. Given the substantial risks and lack of evidence to justify those risks, the State could and did reasonably enact the challenged laws.

\*　　\*　　\*

31

As explained in the equal-protection section, the challenged laws more than satisfy rational-basis review—and then some. After all, the State has a compelling governmental interest in protecting children. *Otto v. City of Bocan Raton*, 981 F.3d 854, 868 (11th Cir. 2020).

## II.    Irreparable Harm Isn't Established.

The district court's irreparable harm analysis is one sentence: without puberty blockers and cross-sex hormones, Plaintiffs will suffer irreparable harm. Doc.90 at 39-40. Perhaps the district court was satisfied with Plaintiffs' medical records. After all, the absence of medical records made the difference to the district court in the *Dekker* case. As the district court stated in the *Dekker* preliminary-injunction hearing:

> The other reason for denying a preliminary injunction is that the record does not include medical records for these plaintiffs. Before I enter an injunction that would lead to a requirement or it might lead to a requirement to provide service to these plaintiffs, the record would need to include medical opinions that this treatment is indeed necessary, that these plaintiffs are going to suffer irreparable harm from the denial of care. Perhaps I could make that finding based just on their declarations alone, but my finding is that those declarations are not sufficient to establish irreparable harm for these plaintiffs at this time based on this record.

*Dekker* P.I. Tr.113:12-22.

Yet the State didn't have any access to Plaintiffs' medical records in this case before the preliminary-injunction motion, while the motion was pending, and even after the motion was granted. That certainly hampered the State's ability to defend its laws and raises significant procedural-due-process issues.

In any event, throwing medical records doesn't establish irreparable harm.

32

### III. The Balance of Harms & the Public Interest Don't Favor Plaintiffs.

The district court's analysis of the remaining preliminary-injunction factors was similarly brief: it stated that "the treatment will affect the patients themselves, nobody else, and will cause the defendants no harm. The preliminary injunction will be consistent with, not adverse to, the public interest. Adherence to the Constitution is always in the public interest." Doc.90 at 40.

As established above, the State adhered to constitutional dictates. And the State is harmed by the injunction—it's greatly harmed by being prevented from "effectuating statutes enacted by representatives of its people" and regulations enacted by medical boards. *Maryland v. King*, 567 U.S. 1301, 1303 (2012); *L.W.*, 73 4th at 421 (a State is harmed "from its inability to enforce the will of its legislature, to further the public-health considerations undergirding the law, and to avoid irreversible health risks to its children").

The public interest is also being harmed. Because of the preliminary injunction, Plaintiffs are at risk of receiving medical treatments that could lead to permanent, negative health consequences. Certainly, the State's "interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State at this juncture." *L.W.*, 73 4th at 421-22.

## <u>CONCLUSION</u>

District courts, WPATH, and the Endocrine Society don't get to make medical policy. The State of Florida does. The district court erred in concluding otherwise. For

the reasons expressed above, this Court should reverse the district court's grant of a preliminary injunction.

Dated: September 6, 2023

/s/ *Mohammad O. Jazil*
Mohammad O. Jazil
Michael Beato
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
Phone: (850) 391-0503
Facsimile: (850) 741-1023
mjazil@holtzmanvogel.com
mbeato@holtzmanvogel.com
*Counsel for Defendants-Appellants Surgeon General, Florida Department of Health, Florida Board of Medicine and Individual Members, and Florida Board of Osteopathic Medicine and Individual Members*

Ashley Moody
*Attorney General of Florida*

/s/ *Joseph E. Hart*
Henry C. Whitaker
 *Solicitor General*
Joseph E. Hart
 *Counselor to the Attorney General*
PL-01 the Capitol
Tallahassee, FL 32399
Phone: (850) 414-3300
henry.whitaker@myfloridalegal.com
joseph.hart@myfloridalegal.com
*Counsel for Defendants-Appellants William Gladson, Florida Surgeon General, and Florida Department of Health*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with the typeface and type-style requirements of Rule 32.

Dated: September 6, 2023              /s/ *Mohammad O. Jazil*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing certificate was filed on ECF.

Dated: September 6, 2023              /s/ *Mohammad O. Jazil*