No. 23-12159

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

*Jane Doe et al.*,
Plaintiffs-Appellees,

v.

*Surgeon General, State of Florida et al.*,
Defendants-Appellants.

U.S. District Court for the Northern District of Florida, No. 4:23-cv-114
(Hinkle, J.)

## ANSWER BRIEF OF PLAINTIFFS-APPELLEES

Christopher F. Stoll
Kelly Jo Popkin
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org

*Counsel for Plaintiffs-Appellees*

Thomas E. Redburn, Jr.
Maya Ginsburg
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700
mginsburg@lowenstein.com

(Additional counsel listed on inside cover)

Simone Chris
Chelsea Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

Chris Erchull
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont
Suite 950
Boston, MA 02108
(617) 426-1350

Sarah Warbelow
Cynthia Cheng-Wun Weaver
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180

*Counsel for Plaintiffs-Appellees*

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 23-12159

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Plaintiffs-Appellees certify that the following have an interest in the outcome of this case:

1.  Academic Pediatric Association, *Amicus*

2.  Ackerman, Scot, *Defendant*

3.  American Academy of Child and Adolescent Psychiatry, *Amicus*

4.  American Academy of Family Physicians, *Amicus*

5.  American Academy of Nursing, *Amicus*

6.  American Academy of Pediatrics, *Amicus*

7.  American Association of Physicians for Human Rights, Inc., *Amicus*

8.  American College of Obstetricians and Gynecologists, *Amicus*

9.  American College of Osteopathic Pediatricians, *Amicus*

10. American College of Physicians, *Amicus*

11. American Medical Association, *Amicus*

12. American Pediatric Society, *Amicus*

13. Antommaria, Armand, *Dekker Witness*[1]

---

[1] As Defendants-Appellants correctly noted in their opening brief, the preliminary injunction was decided on "the written filings in this case and the record compiled in a separate case in this court with overlapping issues, *Dekker v. Weida,* No. 4:22cv325-RH-MAF." Doc. 90 at 2.

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 23-12159

14.  Archer, Phil, *Former Defendant*

15.  Aronberg, Dave, *Former Defendant*

16.  Association of American Medical Colleges, *Amicus*

17.  Association of Medical School Pediatric Department Chairs, Inc., *Amicus*

18.  Baker, Kellan, *Dekker Witness*

19.  Bakkedahl, Thomas, *Former Defendant*

20.  Barsoum, Wael, *Defendant*

21.  Bartlett, Bruce, *Former Defendant*

22.  Basford, Larry, *Former Defendant*

23.  Beato, Michael, *Counsel for Defendants*

24.  Bell, Daniel, *Counsel for Defendants*

25.  Benson, Matthew, *Defendant*

26.  Biggs, Michael, *Defendant Witness*

27.  Boe, Bennett, *Plaintiff*

28.  Boe, Brenda, *Plaintiff*

29.  Brackett, Matthew, *Dekker Witness*

30.  Brodsky, Ed, *Former Defendant*

31.  Bruggeman, Brittany, *Declarant*

32.  Bruno, Nichole, *Plaintiff Gavin Goe's Doctor*

---

Therefore, expert and expert-related witnesses in the *Dekker* case are included in this CIP. The *Dekker* case is now on appeal in this Court, No. 23-12155.

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 23-12159

33.  Campbell, Jack, *Former Defendant*

34.  Cantor, James, *Dekker Witness*

35.  Chriss, Simone, *Counsel for Plaintiffs*

36.  Coe, Carla, *Plaintiff*

37.  Coe, Christina, *Plaintiff*

38.  Coffman, Gregory, *Defendant*

39.  Creegan, Chris, *Defendant*

40.  Derick, Amy, *Defendant*

41.  Di Pietro, Tiffany, *Defendant*

42.  Diamond, David, *Defendant*

43.  Doe, Jane, *Plaintiff*

44.  Doe, Susan, *Plaintiff*

45.  Donovan, Kevin, *Dekker Witness*

46.  Ducatel, Watson, *Defendant*

47.  Dunn, Chelsea, *Counsel for Plaintiffs*

48.  Durrett, John, *Former Defendant*

49.  Edmiston, Kale, *Dekker Witness*

50.  Endocrine Society, *Amicus*

51.  English, Jeffrey, *Dekker Witness*

52.  Erchull, Christopher, *Counsel for Plaintiffs*

53.  Florida Agency for Healthcare Administration, *Dekker Defendant*

54.  Florida Board of Medicine, *Defendant*

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 23-12159

55.  Florida Board of Osteopathic Medicine, *Defendant*

56.  Florida Chapter of the American Academy of Pediatrics, *Amicus*

57.  Foe, Fiona, *Plaintiff*

58.  Foe, Freya, *Plaintiff*

59.  Fox, Amira, *Former Defendant*

60.  Garcia, Maria, *Defendant*

61.  Ginsburg, Maya, *Counsel for Plaintiffs*

62.  Gladson, William, *Defendant*

63.  Goe, Gavin, *Plaintiff*

64.  Goe, Gloria, *Plaintiff*

65.  Goldberg, Noah, *Counsel for Amicus*

66.  Haas, Brian, *Former Defendant*

67.  Hart, Joseph, *Counsel for Defendants*

68.  Hinkle, Robert, *U.S. District Court Judge*

69.  Hruz, Paul William, *Dekker Witness*

70.  Hunter, Patrick, *Defendant*

71.  Hutton, Kim, *Dekker Witness*

72.  Isasi, William, *Counsel for Amicus*

73.  Jackson, Valerie, *Defendant*

74.  Jacobs, Arthur, *Counsel for Former Defendants & Defendant*

75.  Janssen, Aron Christopher, *Dekker Witness & Doe Declarant*

76.  Jazil, Mohammad, *Counsel for Defendants*

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 23-12159

77.   Justice, Nicole, *Defendant*

78.   Kaliebe, Kristopher Edward, *Dekker Witness*

79.   Karasic, Dan, *Dekker Witness*

80.   Kirsh, William, *Defendant*

81.   Kramer, Brian, *Former Defendant*

82.   Ladapo, Joseph, *Defendant*

83.   Laidlaw, Michael, *Dekker Witness*

84.   Lannin, Cortlin, *Counsel for Amicus*

85.   Lappert, Patrick, *Dekker Witness*

86.   Larizza, R.J., *Former Defendant*

87.   Levi, Jennifer, *Counsel for Plaintiffs*

88.   Levine, Stephen, *Dekker Witness*

89.   Loe, Linda, *Plaintiff*

90.   Loe, Lisa, *Plaintiff*

91.   Lopez, Susan, *Former Defendant*

92.   Madden, Ginger, *Former Defendant*

93.   Mandelbaum, Sara, *Counsel for Plaintiffs*

94.   Marstiller, Simone, *Dekker Former Defendant*

95.   Minter, Shannon, *Counsel for Plaintiffs*

96.   Mondry, Emily, *Counsel for Amicus*

97.   Moody, Ashley, *Former Defendant*

98.   Mortensen, Monica, *Defendant*

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 23-12159

99.  Nangia, Geeta, *Dekker Witness*

100.  National Association of Pediatric Nurse Practitioners, *Amicus*

101.  Nelson, Melissa, *Former Defendant*

102.  Olson-Kennedy, Johanna, *Dekker Witness*

103.  Pages, Luz, *Defendant*

104.  Patel, Ami, *Counsel for Plaintiffs*

105.  Pediatric Endocrine Society, *Amicus*

106.  Peral, Stephanie, *Counsel for Plaintiffs*

107.  Percival, James, *Counsel for Defendants*

108.  Perko, Gary, *Counsel for Defendants*

109.  Pimentel, Eleonor, *Defendant*

110.  Poe, Patricia, *Plaintiff*

111.  Poe, Paul, *Plaintiff*

112.  Popkin, Kelly Jo, *Counsel for Plaintiffs*

113.  Pratt, Joshua, *Counsel for Dekker Defendants*

114.  Pryor, Harold, *Former Defendant*

115.  Redburn, Thomas, Jr., *Counsel for Plaintiffs*

116.  Romanello, Nicholas, *Defendant*

117.  Fernandez-Rundle, Katherine, *Former Defendant*

118.  Schechter, Loren, *Dekker Witness*

119.  Scott, Sophie, *Dekker Witness*

120.  Shumer, Daniel, *Dekker Witness & Doe Declarant*

*Jane Doe et al., v. Surgeon General, State of Florida et al.*,
No. 23-12159

121. Silverman, Lawrence, *Counsel for Plaintiffs*

122. Societies for Pediatric Urology, *Amicus*

123. Society for Adolescent Health and Medicine, *Amicus*

124. Society for Pediatric Research, *Amicus*

125. Society of Pediatric Nurses, *Amicus*

126. Stafford, William, III, *Counsel for Defendants*

127. Starr, Jason, *Counsel for Plaintiffs*

128. Stoll, Christopher, *Counsel for Plaintiffs*

129. Van Meter, Quentin, *Dekker Witness*

130. Van Mol, Andre, *Dekker Witness*

131. Veta, D. Jean, *Counsel for Amicus*

132. Vila, Hector, *Defendant*

133. Ward, Dennis, *Former Defendant*

134. Wasylik, Michael, *Defendant*

135. Weaver, Cynthia, *Counsel for Plaintiffs*

136. Weida, Jason, *Dekker Defendant*

137. Whitaker, Henry, *Counsel for Defendants*

138. Williams, Gregory, *Defendant*

139. World Professional Association for Transgender Health, *Amicus*

140. Worrell, Monique, *Former Defendant*

141. Zachariah, Zachariah, *Defendant*

142. Zanga, Joseph, *Dekker Witness*

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 23-12159

Per Circuit Rule 26.1-2(c), Plaintiffs-Appellees certify that the CIP

contained herein is complete.

Date: November 6, 2023

*s/ Thomas E. Redburn, Jr.*
Thomas E. Redburn, Jr.
Counsel for Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees respectfully request oral argument in this case.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

COUNTERSTATEMENT OF THE ISSUES ........................................... 2

STATEMENT OF THE CASE ................................................................. 3

    A.      Gender Dysphoria and Standards of Care............................ 3

    B.      The Board Rules................................................................... 8

    C.      SB 254................................................................................. 8

    D.      Plaintiffs-Appellees............................................................. 10

    E.      Course of Proceedings and Disposition in the District Court ..................................................................................... 13

STANDARD OF REVIEW ..................................................................... 18

SUMMARY OF ARGUMENT ................................................................ 18

ARGUMENT ......................................................................................... 22

I.     THE DISTRICT COURT CORRECTLY CONCLUDED THAT SB 254 AND THE BOARD RULES LIKELY VIOLATE THE EQUAL PROTECTION CLAUSE ...................... 22

    A.      The District Court Correctly Found That the Bans Were Enacted in Substantial Part to Discourage Transgender People from Living Consistent with Their Gender Identities and to Express Disapproval of Transgender Status ....................................................... 23

        1.     The Bans' Impact Falls Disproportionately on Transgender Adolescents Because the Law Prohibits Medications Only When Used for Gender Transition....................................................... 23

2.    The District Court Correctly Found that the Bans Were Motivated by Purposeful Discrimination ............................................................ 24

a. The Bans' Impact Falls Disproportionately on Transgender Adolescents ............................................. 25

b. The Bans Are Part of a Broader Context in Which Florida Has Subjected Transgender People to Adverse Treatment .................................................................. 26

c. The Specific Events Leading to the Bans Were Surrounded by Departures from Normal Process and Demonstrate Discriminatory Purpose ......................... 30

d. Contemporaneous Statements Demonstrate that Animus Motivated the Bans ........................................ 34

e. Florida Had Many Less Discriminatory Alternatives Available to Advance Each of its Asserted State Interests, but Instead Elected to Enact a Total Medical Care Ban Only for Transgender Adolescents ............. 36

B.    The District Court Correctly Concluded that Defendants' Proffered Justifications for the Bans Fail Any Level of Scrutiny .......................................................... 38

1.    The District Court Correctly Rejected Defendants' Claim that the Bans Protect Patients from Treatments Supported by "Low Quality" Evidence ........................................................ 41

2.    The District Court Correctly Rejected Defendants' Claim that the Bans Protect Patients from Risks .................................................... 44

3.    The District Court Correctly Rejected Defendants' Claim that the Bans Are Necessary to Remedy Bias in Medical Organizations ................. 46

4.    The District Court Correctly Rejected Defendants' Claim that the Bans Are Necessary to Prevent Noncompliance with Standards of

Care or to Conform to Standards from Other Countries .................................................................. 47

5. The District Court Correctly Rejected Defendants' Claim that the Bans Are Necessary Because the Use of the Relevant Medications to Treat Transgender Patients is Off-Label ................... 50

II. THE OTHER PRELIMINARY INJUNCTION FACTORS OVERWHELMINGLY SUPPORT THE DISTRICT COURT'S INJUNCTION ............................................. 51

CONCLUSION ........................................................................ 54

CERTIFICATE OF COMPLIANCE ................................................ 56

CERTIFICATE OF SERVICE .................................................... 57

# TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ....................................................17, 20, 40

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs.,
  LLC*,
  425 F.3d 964 (11th Cir. 2005).............................................................. 18, 22

*Bendiburg v. Dempsey*,
  909 F.2d 463 (11th Cir. 1990) ................................................................. 21

*Bowen v. City of New York*,
  476 U.S. 467 (1986) ................................................................................. 53

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
  304 F.3d 1167 (11th Cir. 2002) ............................................................... 21

*Dekker v. Weida*,
  No. 4:22-cv-325 (N.D. Fla. 2022) .....................................................*passim*

*\*Eknes-Tucker v. Governor of Alabama*,
  80 F.4th 1205 (11th Cir. 2023) .........................................................*passim*

*FTC v. On Point Cap. Partners LLC*,
  17 F.4th 1066 (11th Cir. 2021) ............................................................... 18

*Hooper v. Bernalillo Cnty. Assessor*,
  472 U.S. 612 (1985) ................................................................................. 40

*Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ............................................................... 24

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994) ................................................................................. 19

*\*League of Women Voters of Florida v. Florida Secretary of State*,
  66 F.4th 905 (11th Cir. 2023) ...............................................2, 20, 24, 25

---

\* Authorities upon which Plaintiffs-Appellees primarily rely are marked with asterisks.

*Otto v. City of Boca Raton,*
  981 F.3d 854 (11th Cir. 2020) ..................................................... 54

*Parham v. J.R.,*
  442 U.S. 584 (1979) .................................................................... 21

*Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,*
  740 F.2d 892 (11th Cir. 1984) (per curiam) ............................... 18

*Romer v. Evans,*
  517 U.S. 620 (1996) .............................................................. 40, 41

*Thompson v. Alabama,*
  65 F.4th 1288 (11th Cir. 2023) ................................................... 20

*United States Dep't of Agric. v. Moreno,*
  413 U.S. 528 (1973) .................................................................... 40

*United States v. Virginia,*
  518 U.S. 515 (1996) .............................................................. 19, 39

*Vance v. Bradley,*
  440 U.S. 93 (1979) ...................................................................... 41

*\*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977) ....................................................2, 20, 26, 30

*Washington v. Davis,*
  426 U.S. 229 (1976) .................................................................... 20

*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016) .................................................. 18

## Statutes

2023 Fla. Laws, Ch. 2023-90 ..........................................................8, 9

Fla. Stat. § 61.517 ........................................................................9, 29

Fla. Stat. § 286.311 ........................................................................ 10

Fla. Stat. § 456.001(9) ..............................................................1, 9, 25

*Fla. Stat.* § 456.52 ..............................................................1, 9, 10, 25

**Other Authorities**

Am. Acad. Pediatrics Comm. Drugs, *Off-Label Use of Drugs in Children* ................................................................................................ 50, 51

*An Act Relating to Treatments for Sex Reassignment: Hearing on S.B. 254 Before the Fla. H.R.*, 2023 Leg., 125th Reg. Sess. (Fla. Apr. 19, 2022) (statement of Rep. Dean Black), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=886 ........................ 36

Brandon Girod, *Four new Florida laws target transgender, broader LGBTQ community. Here's what they do*, Pensacola News J., (May 17, 2023, 12:38 PM) ............................................................................... 26

Brett Wilkins, *DeSantis Signs Most Extreme Slate of Anti-Trans Laws in Modern History*, Common Dreams (May 17, 2023) .............................. 26

C.A. Bridges, *What can I do if I'm a transgender person living in Florida? State erasing trans options,* Tallahassee Democrat, May 18, 2023 ........................................................................................... 29

Carlos Suarez and Denise Royal, *Florida's private colleges and universities must comply with rule requiring people to use bathrooms aligning with their sex assigned at birth*, CNN (Oct. 19, 2023, 11:46 PM) ................................................................................. 27

Fla. Admin. Code r. 64B15-14.014 ............................................................ 1, 8

Fla. Admin. Code r. 64B8-9.019 .......................................................... 1, 8, 28

Fla. S. Bill Analysis and Fiscal Impact Statement, CS/SB 254 .............. 33, 34

Fla. Boards of Medicine and Osteopathic Medicine, *Rule Hearing*: *Standards of Practice for the Treatment of Gender Dysphoria in Minors*, Fla. Admin. Code Ann. r. 64B9-9.019 and 64B15-14.014, (Feb. 10, 2023) https://www.flrules.org/Gateway/View_notice.asp?id=26833612 ........................ 33

Fla. Dep't of Health, *Florida Department of Health Releases Guidance on Treatment of Gender Dysphoria for Children and Adolescents* (Apr 20, 2022), https://www.floridahealth.gov/newsroom/2022/04/20220420-gender-dysphoria-press-release.pr.html?aff_id=1262 ......................................... 31

*Florida Gov. DeSantis signs bills targeting drag shows, trans rights, and care for transgender children*, PBS (May 17, 2023, 2:09 PM) ........................ 26

*Gender Clinical Interventions: Hearing on H.B. 1421 Before the H.
    Healthcare Regul. Subcomm.*, 2023 Leg., 125th Sess., at 1:53:53 to
    1:54:09 (Fla. Mar. 22, 2023) (statement of Rep. Melony M. Bell,
    Member, H. Healthcare Regul. Subcomm.),
    https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8694 ..................... 35

*Gender Clinical Interventions: Hearing on H.B. 1421 Before the H.
    Healthcare Regul. Subcomm.*, 2023 Leg., 125th Sess., at 32:57-
    35:51; 2:03:54-2:03:58 (Fla. Mar. 22, 2023) (statement of Rep.
    Randy Fine),
    https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8694 ..................... 36

H.B. 1069, 2023 Leg., 125th Reg. Sess. (Fla. 2023) ....................................... 28

H.B. 1521, 2023 Leg., 125th Reg. Sess. (Fla. 2023) ....................................... 28

H.B. 1557, 2022 Leg., 124th Reg. Sess. (Fla. 2022) ....................................... 27

Kathryn Varn, *A rundown of Florida bills causing 'massive panic' in
    transgender, LGBTQ communities*, Tallahassee Democrat (Mar. 15,
    2023, 5:07 AM) ................................................................................. 26

Marc Caputo, *DeSantis Moves to Ban Transition Care for Transgender
    Youths, Medicaid Recipients*, NBC News (June 2, 2022, 8:55 PM)
    https://www.nbcnews.com/politics/politics-news/desantis-moves-
    ban-transition-care-transgender-youth-medicaid-recipien-
    rcna31736 .......................................................................................... 33

Pro. Staff of the Comm. on Fiscal Pol'y, Fla. S. Bill Analysis and Fiscal
    Impact Statement, CS/SB 254 (Mar. 22, 2023) ....................................... 33

S.B. 1028, 2021 Leg., 123rd Reg. Sess. (Fla. 2021) ..................................... 27

S.B. 1438, 2023 Leg., 125th Reg. Sess. (Fla. 2023) ..................................... 28

State Surgeon General Joseph A. Ladapo, M.D., *Letter to the Florida
    Board of Medicine* (June 2, 2022),
    https://www.documentcloud.org/documents/22050967-board-letter ..................... 33

Steve Contorno, *Florida bills that will alter the lives of transgender
    people await DeSantis' signature*, CNN (May 4, 2023, 4:27 PM). ......................... 26

Thalia Beaty, Brendan Farrington, and Hannah Schoebaum,
    *Transgender adults in Florida 'blindsided' that new law also limits
    their access to health care*, ABC News, (June 4, 2023, 11:23 AM) ........................ 27

Tori Otten, *Florida Passes Bill Allowing Trans Kids to Be Taken From Their Families*, The New Republic, (May 4, 2023, 1:39 PM) ................................. 27

U.S. Dep't of Health & Human Servs., *Statement by HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth,* https://www.hhs.gov/about/news/2022/03/02/statement-hhs-secretary-xavier-becerra-reaffirming-hhs-support-and-protection-for-lgbtqi-children-and-youth.html .......................................................... 30

## INTRODUCTION

In 2023, in rapid succession, the Florida Board of Medicine, the Florida Board of Osteopathic Medicine (collectively, the "Boards"), and the Florida Legislature each enacted a total ban on the use of puberty blockers and hormones to treat transgender people under the age of eighteen ("SB 254" and the "Board Rules"). *See* Fla. Stat. § 456.001(9)(a); *id.* § 456.52; Fla. Admin. Code r. 64B8-9.019; Fla. Admin. Code r. 64B15-14.014 (collectively, the "Bans"). Each of these provisions bans any use of these therapies "to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex"—while expressly permitting their use for non-transgender minors with other conditions. Fla. Stat. § 456.001(9)(a)1, (9)(a)2; *id.* § 456.001(9)(b). Even if a transgender adolescent, their parents, and their healthcare providers all agree that the treatment is vital to the adolescent's health and well-being, and even though these treatments are part of the accepted standard of care in appropriate cases, the Bans make it illegal regardless of individual medical need.

After considering extensive expert testimony and other evidence, the district court found that this extraordinary statute and the Board

Rules that preceded it were motivated by purposeful discrimination against transgender people and that the State's asserted justifications for the Bans were pretextual and do not rationally advance any legitimate governmental objective. The district court's findings were not clearly erroneous and are entitled to deference from this Court.

Based on those findings, well-settled law, including this Court's own recent decision in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), supports affirmance of the district court's preliminary injunction.

## COUNTERSTATEMENT OF THE ISSUES

1.    Whether the district court correctly applied heightened scrutiny on the ground that the Bans have a disparate effect on transgender people and were motivated by a discriminatory purpose. *See, e.g.*, *League of Women Voters of Florida v. Florida Secretary of State*, 66 F.4th 905, 922 (11th Cir. 2022) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)).

2.    Whether the district court committed clear error in finding that Florida's purported justifications for the Bans were pretextual and unsupported by credible evidence.

3.    Whether the district court abused its discretion in finding that Plaintiffs would suffer immediate and irreparable harm in the absence of a preliminary injunction and that the balance of harms and public interest weighed in favor of granting a preliminary injunction.

## STATEMENT OF THE CASE

As Defendants note, briefing and argument on the preliminary injunction motion in this action proceeded at roughly the same time as the trial in *Dekker v. Weida*, No. 4:22-cv-325 (N.D. Fla. 2022). *Dekker* addressed similar constitutional issues concerning restrictions on medical care for transgender Floridians, was assigned to the same District Judge, and involved overlapping counsel and many of the same expert witnesses. For these reasons, the parties agreed that the *Dekker* trial record would be included in the record for this action. Plaintiffs therefore adopt the same conventions as Defendants for citation of the trial record in *Dekker*, with record references from that case identified as "*Dekker* PX" or "DX" for exhibits and "*Dekker* Tr. X" for trial testimony.

### A.    Gender Dysphoria and Standards of Care

Gender identity is a person's internal sense of their sex. Doc. 30-4 at 7-8; Doc. 30-5 at 7. It is innate, has significant biological underpinnings, and is not subject to voluntary change. Doc. 30-4 at 9–11;

Doc. 30-5 at 7. Every person has a gender identity. For most people, their gender identity aligns with their birth sex. For transgender people, however, that is not the case. Doc. 30-4 at 7–8.

Gender dysphoria is a serious medical condition that has been recognized and treated for decades. Doc. 30-4 at 12; Doc. 30-6 at 8–9. Gender dysphoria refers to the distress that arises from the conflict between a transgender person's birth sex and their gender identity. Doc. 30-4 at 12; Doc. 30-6 at 7–8. Gender dysphoria can be experienced by both youth and adults; it is rare, occurring in less than one percent of the population. Doc. 30-6 at 7–8, 28. Left untreated, gender dysphoria predictably causes serious harms, including anxiety, depression, distress, self-harm, and, in some cases, suicidality. Doc. 30-4 at 14; Doc. 30-6 at 7–8.

The medical treatments for gender dysphoria are well-established Doc. 30-4 at 14; Doc. 30-6 at 8. The overall course of treatment that allows a transgender person to live consistent with their gender identity is called gender transition. Doc. 30-4 at 22–23; Doc. 30-6 at 9. When individuals with gender dysphoria receive appropriate medical care, their gender dysphoria is alleviated or significantly diminished, enabling them

4

to thrive. Doc. 30-4 at 14; Doc. 30-6 at 19. For minors who experience gender dysphoria, being able to transition and receive appropriate medical care (often referred to as gender-affirming care) may be lifesaving. Doc. 30-6 at 22–23.

For more than four decades, medical practitioners have developed evidence-based standards for the treatment of gender dysphoria. Doc. 30-4 at 15–16; Doc. 30-6 at 8–9. The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published standards and guidelines for treating gender dysphoria in children, adolescents, and adults, representing an expert consensus based on the best available science on transgender healthcare. Doc. 30-4 at 14–17; Doc. 30-6 at 8–9, 19–20.

The specific components of a patient's transition and treatment plan are based on that individual's medical and mental health needs. Doc. 30-4 at 13; Doc. 30-6 at 5, 12, 15. The standards of care for the treatment of gender dysphoria in minors consist of social transition and related medical interventions that allow a young person to live consistently with their gender identity. Doc. 30-4 at 18–19; Doc. 30-5 at 9; Doc. 30-6 at 8–11. Social transition can include a person using a name

and pronouns that better align with their gender identity, wearing clothing and expressing themselves consistent with their gender identity, and amending their legal identification documents to reflect their gender identity. Doc. 30-4 at 15; Doc. 30-5 at 9; Doc. 30-6 at 9–10.

After the onset of puberty, minors diagnosed with gender dysphoria may be prescribed puberty blocking medications to prevent them from continuing to undergo endogenous puberty and developing permanent physical characteristics that conflict with their gender identity. Doc. 30-4 at 21; Doc. 30-6 at 10–11. Before an adolescent is prescribed these medications, a mental health professional must: (1) confirm the persistence of gender dysphoria that has worsened with the onset of puberty; (2) assess whether any coexisting problems that could interfere with treatment have been addressed and whether the minor's situation and functioning are stable enough to start treatment; and (3) ensure the adolescent and their parents or legal guardians understand the risks and benefits of treatment. Doc. 30-4 at 14, 22; Doc. 30-6 at 12-14.

Puberty blocking medications suspend the progression of endogenous puberty at the point treatment begins, limiting the influence of a person's endogenous hormones on their body. Doc. 30-4 at 21–22; Doc.

6

30-6 at 11. For example, a transgender girl on puberty blocking medication would not experience the physical changes caused by testosterone, including facial and body hair, male muscular development, an Adam's apple, or masculinized facial structures. Doc. 30-4 at 21–22; Doc. 30-6 at 10, 20–22. Similarly, a transgender boy on puberty blocking medication would not experience breast development, menstruation, or widening of the hips. Doc. 30-4 at 25; Doc. 30-6 at 10, 20–21.

Treatment with puberty blocking medication is reversible; if a minor stops taking the medication, endogenous puberty resumes. Doc. 30-4 at 22; Doc. 30-6 at 11. In addition to alleviating gender dysphoria, puberty blocking medications may eliminate the need for future surgical treatments to treat ongoing gender dysphoria as an adult. Doc. 30-4 at 22; Doc. 30-6 at 20–21. Puberty blocking medications do not have long-term implications for fertility. Doc. 30-4 at 22, 27.

Later in adolescence, a transgender young person may be prescribed hormone therapy. Doc. 30-4 at 23; Doc. 30-6 at 11. As in the case of puberty blockers, before such therapy begins, a mental health professional must confirm the persistence of gender dysphoria, assess co-occurring conditions and readiness for treatment, and ensure that the

adolescent and their parents are fully informed about the risks and benefits. Doc. 30-4 at 24; Doc. 30-6 at 14–15. Patients who elect to discontinue hormone therapy in adulthood often achieve fertility, and as with many medications, providers ensure that fertility-related risks and benefits are fully understood by patients before initiating treatment. Doc. 30-4 at 27–28.

As with most other medical treatments, providers must obtain informed consent from a minor's parents or legal guardians before a minor receives treatment for gender dysphoria. Doc. 30-4 at 22; Doc. 30-5 at 12–15; Doc. 30-6 at 12, 16–17, 23.

## B.    The Board Rules

Effective on March 16, 2023, and March 28, 2023, respectively, the Florida Board of Medicine and the Florida Board of Osteopathic Medicine implemented identical rules prohibiting health care providers in Florida from prescribing or administering "[p]uberty blocking, hormone, [or] hormone antagonist therapies" for transgender minors. *See* Fla. Admin. Code r. 64B8-9.019(1); Fla. Admin. Code r. 64B15-14.014(1).

## C.    SB 254

On May 4, 2023, the Florida Legislature voted to pass SB 254, which Governor Ron DeSantis signed into law on May 17, 2023. 2023 Fla.

Laws, Ch. 2023-90 at 6. It became effective that same date. *Id.* SB 254 includes multiple provisions, all relating to transgender people. *See id.*

Of particular relevance to this appeal, the statute prohibits the use of "puberty blockers" for persons under 18 to "stop or delay normal puberty in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex." Fla. Stat. § 456.001(9)(a)1; *see id.* § 456.52. The statute also prohibits the use of "hormones or hormone antagonists to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex." *Id.* § 456.001(9)(a)2. The statute makes violation of these provisions a criminal offense and grounds for terminating a healthcare practitioner's license. *See id.* § 456.52(1), (5).

In addition to these prohibitions, the law grants Florida courts temporary emergency jurisdiction for minors present in the state who have been "subjected to" or "threatened with" hormone therapy or other forms of gender transition related care, allowing a court to grant physical custody to a petitioner who objects to the minor's prescribed treatment for gender dysphoria. Fla. Stat. § 61.517. The statute also bars the use of state funds to cover medical treatments for gender transition for either

minors or adults, Fla. Stat. § 286.311, and imposes restrictions on the provision of transition-related care for transgender adults. Fla. Stat. § 456.52(2)-(4).

Plaintiffs moved for a preliminary injunction against enforcement of SB 254's ban on puberty blocking medication and hormone therapy for transgender youth, as well as against enforcement of the Board Rules.

### D.     Plaintiffs-Appellees

This action was brought by seven Parent Plaintiffs on behalf of their transgender children. Three of those plaintiffs sought preliminary relief because their children had an imminent need for medical treatment for gender dysphoria, which they would be prohibited from receiving under SB 254 and the Board Rules. *See* Doc. 90 at 1-2.

1.     Susan Doe is an eleven-year-old transgender girl. Doc. 30-1 at 2. Susan has identified as a girl from a young age. *Id.* When Susan was three years old, she began experiencing distress about wearing male clothing. *Id.* at 3. Eventually, Susan's mother Jane sought advice from her pediatrician. *Id.* When Susan was allowed to dress as a girl and when those around her interacted with her as a girl, she became happier, more secure, and flourished. *Id.*

At the time the preliminary injunction motion was filed, Susan was about to begin puberty. *Id.* at 5. Her psychotherapist concluded that she has no mental health issues or other concerns that would contraindicate puberty blockers and advised that Susan see a pediatric endocrinologist for continued assessment. *Id.* Susan's treating professionals have included the physician who oversees the United States military's transgender health program and a multidisciplinary team at the University of Florida Health Youth Gender Program. *Id.* at 4–5. Susan's multidisciplinary medical treatment team agreed that it would likely be medically necessary for Susan to initiate medication very soon. *Id.* at 6. If unable to receive medical treatment, Susan will experience the effects of male puberty, which will cause her to develop physical traits inconsistent with her female gender identity, bringing back and exacerbating the distress that she experienced before she socially transitioned. *Id.* at 6–7.

2.      Lisa Loe is an eleven-year-old transgender girl. Doc. 30-2 at 2. From an early age, Lisa identified and wished to dress as a girl. *Id.* at 2–3. In 2022, Lisa was diagnosed with gender dysphoria. *Id.* at 3. When Lisa's parents, following guidance from a psychologist, began allowing

her to live consistently with her gender identity, they saw Lisa's overall well-being improve greatly. *Id.*

At the time of the preliminary injunction motion, Lisa's endocrinologist had confirmed that Lisa has gender dysphoria and had entered puberty. *Id.* at 4. He counseled that Lisa would need puberty blockers administered within the next few months but informed Linda that he could not prescribe them because of the Bans. *Id.* If Lisa is unable to receive the medical care she needs, her health and well-being will suffer. *Id.* at 5–6.

3.    Gavin Goe is an eight-year-old transgender boy. Doc. 30-3 at 2. Gavin has known that he is a boy from a young age. *Id.* at 2. Due to Gavin's distress from being treated as a girl, Gavin's parents eventually allowed him to wear boys' clothes to school and use male pronouns, and later, to use a male name. *Id.* at 3.

In 2021, Gavin was diagnosed with gender dysphoria by a pediatrician, who recommended in 2023 that Gavin see a pediatric endocrinologist because puberty might be approaching. *Id.* at 4.   The pediatrician advised that Gavin should be assessed regularly by an endocrinologist for readiness for puberty blockers. *Id.* When Gloria made

12

an appointment for Gavin at a clinic, she learned that the clinic was no longer seeing new patients because of the Board Rules. *Id.* at 5. If Gavin cannot receive puberty blockers, he will begin developing physical characteristics that will predictably worsen the symptoms of his gender dysphoria and cause him serious psychological distress. *Id.* Ex. A.

### E. Course of Proceedings and Disposition in the District Court

Plaintiffs filed this action shortly after adoption of the Board Rules, alleging that those rules violated the Due Process and Equal Protection Clauses. Doc. 1. After SB 254 was enacted, Plaintiffs filed an amended complaint adding constitutional challenges to the statute as well as the rules. Doc. 59. Three of the Plaintiffs moved for an order preliminarily enjoining the Board Rules and the provisions of SB 254 that ban medically necessary care for transgender minors ("the Bans"). Doc. 30; Doc. 57.

On June 6, 2023, the district court granted the motion and entered a preliminary injunction. Doc. 90. The district court's order included numerous factual findings based on both the evidence Plaintiffs submitted in support of the motion and on the trial testimony in *Dekker*. Among other things, the district court found:

(1) "Gender identity is real," a fact that was admitted by both the medical Defendants[2] and the only defense medical expert who has treated a significant number of transgender patients. Doc. 90 at 4-5.

(2) "There are well-established standards of care for treatment of gender dysphoria." Doc. 90 at 7. The standards include the Endocrine Society Guidelines and WPATH standards, and "these standards are widely followed by well-trained clinicians." *Id*.

(3) "The overwhelming weight of medical authority supports treatment of transgender patients with GnRH agonists [i.e., puberty blockers] and cross-sex hormones in appropriate circumstances." Doc. 90 at 9.

(4) "These medications–GnRH agonists, testosterone, and estrogen–have been used for decades to treat other conditions. Their safety records and overall effects are well known." Doc. 90 at 10.

---

[2] The district court used the term "medical defendants" to refer to the Surgeon General, the Boards, and their members. Doc. 90 at 2.

(5) "[F]or gender dysphoria, just as for central precocious puberty, GnRH agonists are an effective treatment whose benefits can outweigh the risks. The same is true for cross-sex hormones." Doc. 90 at 11.

(6) "Even the defendants' expert Dr. Levine testified that treatment with GnRH agonists and cross-sex hormones is sometimes appropriate. He would demand appropriate safeguards . . . but he would not ban the treatments." Doc. 90 at 11-12.

(7) "The clinical evidence would support . . . a decision by a reasonable patient and parent, in consultation with properly trained practitioners, to use GnRH agonists at or near the onset of puberty and to use cross-sex hormones later, even when fully apprised of the current state of medical knowledge and all attendant risks." Doc. 90 at 12.

(8) "The record includes no evidence that these treatments have caused substantial adverse clinical results in properly screened and treated patients." Doc. 90 at 13.

(9) "[P]laintiffs are likely to succeed on their claim that they have obtained appropriate medical care for their children to this point,

that qualified professionals have properly evaluated the children's medical conditions and needs in accordance with the well-established standards of care, and that the plaintiffs and their children, in consultation with their treating professionals, have determined that the benefits of treatment with GnRH agonists, and eventually with cross-sex hormones, will outweigh the risks." Doc. 90 at 16.

(10) "[T]he plaintiffs' ability to evaluate the benefits and risks of treating their individual children this way far exceeds the ability of the State of Florida to do so." Doc. 90 at 16-17.

Based on these factual findings, the district court concluded that Plaintiffs were likely to succeed on their equal protection and due process claims, and that all other factors supported the issuance of a preliminary injunction.

With respect to equal protection, the district court concluded that intermediate scrutiny was required because the Bans facially discriminate based on sex and transgender status. *See* Doc. 90 at 19-23. The court also concluded that intermediate scrutiny was required for an additional, independent reason: "State action motivated by purposeful

discrimination, even if otherwise lawful, violates the Equal Protection Clause." Doc. 90 at 26 (citing *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 810 (11th Cir. 2022)). The district court found, based on the record evidence, that "[t]he statute and rules at issue were motivated in substantial part by the plainly illegitimate purposes of disapproving transgender status and discouraging individuals from pursuing their honest gender identities. This was purposeful discrimination . . . ." Doc. 90 at 26.

With respect to due process, the district court concluded that the Bans infringed the Parent Plaintiffs' "right to control a child's medical treatment." Doc. 90 at 27.

Applying the applicable standards to Defendants' asserted justifications for the Bans, the district court concluded that Defendants' asserted justifications for the Bans were "largely pretextual," and failed even rational basis review. Doc. 90 at 27.

Finally, the district court concluded that the remaining preliminary injunction factors were satisfied because "[t]he plaintiffs' adolescent children will suffer irreparable harm—the unwanted and irreversible onset and progression of puberty in their natal sex—if they do not

promptly begin treatment with GnRH agonists." Doc. 90 at 39-40. By contrast, the State of Florida would suffer no harm if an injunction issued, and an injunction was in the public interest. Doc. 90 at 40.

## STANDARD OF REVIEW

"Appellate review of a preliminary-injunction decision . . . is exceedingly narrow because of the expedited nature of the proceedings in the district court." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). "The district court's decision will not be reversed unless there is a clear abuse of discretion." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) (quoting *Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,* 740 F.2d 892, 893 (11th Cir. 1984) (per curiam)). This Court reviews "the preliminary injunction's underlying legal conclusions *de novo* and its findings of fact for clear error." *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1078 (11th Cir. 2021).

## SUMMARY OF ARGUMENT

The district court's decision granting a preliminary injunction is supported by the record and consistent with established law, including this Court's recent decision in *Eknes-Tucker*. In *Eknes-Tucker*, this Court held that bans on medical treatments for gender transition do not facially

discriminate based on transgender status or sex.[3]  Importantly, however, this Court acknowledged that such bans have a disparate impact on "gender nonconforming individuals" and therefore warrant heightened scrutiny if "the regulations [are] a pretext for invidious discrimination against such individuals." 80 F.4th at 1230. This Court held that heightened scrutiny did not apply to Alabama's ban because "the district court did not find that Alabama's law was based on invidious discrimination." *Id.* In contrast, heightened scrutiny applies here because the district court found that the Bans were motivated by "purposeful discrimination." Doc. 90 at 26. That finding was based on substantial evidence and was not clearly erroneous.

Decades of precedent support this Court's affirmation in *Eknes-Tucker* that a law motivated by purposeful discrimination violates the

---

[3] The Plaintiffs in *Eknes-Tucker* have asked the Court to reconsider that holding in a petition for rehearing en banc, which remains pending. The Plaintiffs here also respectfully disagree with that holding. Like Alabama's law, Florida's Bans classify based on transgender status and sex and should be subject to heightened scrutiny for that reason. *See United States v. Virginia*, 518 U.S. 515, 555 (1996) (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994)) (holding that "'all gender-based classifications today' warrant 'heightened scrutiny'"). In this case, however, the district court also relied on an independent equal protection ground that is consistent with this Court's decision in *Eknes-Tucker*, and the ruling should be upheld for that independent reason.

Equal Protection Clause. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 4th 791, 810 (11th Cir. 2022) ("[A] disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by purposeful discrimination."); *Thompson v. Alabama*, 65 F.4th 1288, 1297 (11th Cir. 2023) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)); *see also League of Women Voters*, 66 F.4th at 922 (citing *Arlington Heights*, 429 U.S. at 267).

Under that controlling law, once a plaintiff has established that a law has both a discriminatory impact and purpose, the burden shifts to the government to show that its asserted justifications for the law are not pretextual—*i.e.*, that the law would have been enacted without the discriminatory factor. *See, e.g.*, *League of Women Voters,* 66 F.4th at 922.

Here, the district court carefully considered the evidence, including testimony by experts and others over the course of a seven-day trial in *Dekker* as well as the evidence presented in support of Plaintiffs' preliminary injunction motion. Based on that record, the district court found that SB 254 and the Board Rules were motivated by a discriminatory purpose and that the Defendants' asserted justifications were "largely pretextual." Doc. 90 at 27. In addition, the district court

20

found that those asserted justifications were so unsupported by credible evidence or logic that they would fail even rational basis review. *See* Doc. 90 at 27–39. Because the district court's findings are not clearly erroneous, they warrant deference from this Court. *See, e.g., Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002).

In addition to holding that the Bans likely violate the constitutional guarantee of equal protection, the district court also held that they likely violate parents' fundamental due process right to make medical decisions for their children. Although a panel of this Court rejected a similar parental rights argument in *Eknes-Tucker*, the plaintiffs in that case have asked the Court to reconsider that portion of its decision in a petition for rehearing en banc, and Plaintiffs reassert that claim here in the event rehearing en banc is granted. Both the Supreme Court and this Court have previously held that parents have a constitutionally protected interest in "seek[ing] and follow[ing] medical advice" for their minor children. *Parham v. J.R.,* 442 U.S. 584, 602 (1979); *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990). The Bans burden that right by preventing parents from obtaining the only evidence-based,

21

established medical care for transgender adolescents with gender dysphoria.

Finally, substantial evidence supports the district court's finding that permitting the Bans to take effect would cause serious irreparable harm to the Plaintiffs and that the balance of harms weighs in favor of granting preliminary relief. Those findings also warrant deference from this Court.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT SB 254 AND THE BOARD RULES LIKELY VIOLATE THE EQUAL PROTECTION CLAUSE

In *Eknes-Tucker*, this Court held that bans on medical treatments for gender transition have a disparate impact on "gender nonconforming individuals" and thus warrant heightened scrutiny if "the regulations [are] a pretext for invidious discrimination against such individuals." 80 F.4th at 1230. Here, the district court found that the Bans were motivated by precisely such "purposeful discrimination." Doc. 90 at 26. That finding was based on substantial evidence and was not clearly erroneous. *See, e.g., BellSouth,* 425 F.3d at 968.

**A.**    **The District Court Correctly Found That the Bans Were Enacted in Substantial Part to Discourage Transgender People from Living Consistent with Their Gender Identities and to Express Disapproval of Transgender Status**

**1.**    **The Bans' Impact Falls Disproportionately on Transgender Adolescents Because the Law Prohibits Medications Only When Used for Gender Transition**

SB 254 and the Board Rules have—at a minimum—a disparate impact on transgender people because they ban puberty blockers and hormones only when used to align a person's body with a sex that differs from their sex at birth—that is, only when used for gender transition. As this Court stated in *Eknes-Tucker*, the only people affected by such a ban are transgender. 80 F.4th at 1229 (stating that a law that bars medical treatments for gender transition "restricts a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive").

When a prohibition falls exclusively on individuals in a particular group, it has—at the least—a disparate impact on that group. That is plainly the case here. *See* Doc. 90 at 24 ("To know whether treatment with any of these medications is legal, one must know whether the patient is transgender.").

23

### 2. The District Court Correctly Found that the Bans Were Motivated by Purposeful Discrimination

Substantial evidence supported the district court's finding that the Bans "were motivated in substantial part by the plainly illegitimate purposes of disapproving transgender status and discouraging individuals from pursuing their honest gender identities." Doc. 90 at 26. Under this Court's multifactor test, the "discriminatory intent and effect" of Florida's medical care restrictions are apparent. *League of Women Voters*, 66 F.4th at 922. This Court has summarized the factors courts consider in determining whether a law that does not facially classify on a suspect basis nevertheless requires heightened scrutiny because it was enacted for an invidiously discriminatory purpose:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; ... (5) the contemporary statements and actions of key legislators[;] ... (6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives.

66 F.4th at 922 (quoting *Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299, 1321–22 (11th Cir. 2021)).

24

The record before the district court at the preliminary injunction stage was more than sufficient to support issuance of an injunction barring enforcement of the Bans under this test.

### a. The Bans' Impact Falls Disproportionately on Transgender Adolescents

As this Court has explained, gender transition medical care, "by the nature of things," only affects people who are transgender. *Eknes-Tucker*, 80 F.4th at 1229. SB 254's plain language states that treatments are banned only when they are prescribed "in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex . . . ." Fla. Stat. § 456.001(9)(a)1.; *see id.* § 456.52. In other words, the treatments are banned only when transgender adolescents need them. The record before the district court therefore established not merely a "foreseeab[le] . . . disparate impact," *League of Women Voters,* 66 F.4th at 922, but a disparate impact within the actual "knowledge" of policymakers. *Id.* The Bans' effect on transgender people was not merely *foreseeable*, but a *certainty*. Both the actual effect and the unambiguously stated goal of the Bans was to restrict medical care for transgender people.

**b.    The Bans Are Part of a Broader Context in Which Florida Has Subjected Transgender People to Adverse Treatment**

SB 254 and the Board Rules were enacted as part of an unprecedented wave of bills, laws, and regulations targeting transgender Floridians. This contextual background "reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. As Florida and national media outlets have reported, transgender people were "the subject of intense focus for state lawmakers" in the past two years, with lawmakers in 2023 filing "at least 18 bills that directly or indirectly target transgender Floridians."[4] In addition to restricting

---

[4]Kathryn Varn, *A rundown of Florida bills causing 'massive panic' in transgender, LGBTQ communities*, Tallahassee Democrat (Mar. 15, 2023, 5:07 AM), https://www.tallahassee.com/story/news/politics/2023/03/15/florida-legislature-18-bills-targeting-transgender-lgbtq-community/70002777007/; Brett Wilkins, *DeSantis Signs 'Most Extreme Slate of Anti-Trans Laws in Modern History*, Common Dreams (May 17, 2023), https://www.commondreams.org/news/desantis-transgender; Brandon Girod, *Four new Florida laws target transgender, broader LGBTQ community. Here's what they do*, Pensacola News J., (May 17, 2023, 12:38 PM), https://www.pnj.com/story/news/politics/2023/05/17/desantis-signs-3-bills-targeting-transgender-gender-affirming-care-bathrooms-drag-shows/70227878007/; Steve Contorno, *Florida bills that will alter the lives of transgender people await DeSantis' signature*, CNN (May 4, 2023, 4:27 PM), https://www.cnn.com/2023/05/04/politics/ron-desantis-transgender-bills-florida/; *Florida Gov. DeSantis signs bills targeting*

access to health care, Florida enacted multiple laws and administrative
policies that single out transgender people for adverse treatment in many
areas of their lives. The first of these laws was Senate Bill 1028, signed
into law on May 28, 2021, banning transgender girls and women from
playing on female sports teams. *See* S.B. 1028, 2021 Leg., 123rd Reg.
Sess. (Fla. 2021). The following year, on March 28, 2022, the Legislature
enacted House Bill 1557, banning instruction about LGBTQ people or
issues from kindergarten to third grade. *See* H.B. 1557, 2022 Leg., 124th
Reg. Sess. (Fla. 2022). On May 17, 2023, House Bill 1069 was signed into
law, expanding the scope of House Bill 1557 to include instruction up to

---

*drag shows, trans rights, and care for transgender children*, PBS (May
17, 2023, 2:09 PM), https://www.pbs.org/newshour/politics/florida-gov-
desantis-signs-bills-targeting-drag-shows-trans-rights-and-care-for-
transgender-children; Carlos Suarez and Denise Royal, *Florida's private
colleges and universities must comply with rule requiring people to use
bathrooms aligning with their sex assigned at birth*, CNN (Oct. 19, 2023,
11:46 PM), https://www.cnn.com/2023/10/19/us/florida-private-college-
trans-bathroom-restriction; Thalia Beaty, Brendan Farrington, and
Hannah Schoebaum, *Transgender adults in Florida `blindsided' that new
law also limits their access to health care*, ABC News, (June 4, 2023, 11:23
AM), https://abcnews.go.com/US/wireStory/transgender-adults-florida-
blindsided-new-law-limits-access-99824193; Tori Otten, Florida Passes
Bill Allowing Trans Kids to Be Taken From Their Families, The New
Republic, (May 4, 2023, 1:39 PM),
https://newrepublic.com/post/172444/florida-passes-bill-allowing-trans-
kids-taken-families.

eighth grade, authorizing removal of books from school libraries, and prohibiting public school students, teachers, or staff from using pronouns that differ from their sex at birth. *See* H.B. 1069, 2023 Leg., 125th Reg. Sess. (Fla. 2023). That bill declares that it must be the policy of all schools that "a person's sex is an immutable biological trait" and "it is false" to use a pronoun other than the sex on a person's birth certificate. *Id.*

Another bill signed into law on May 17, 2023, House Bill 1521, excludes transgender people from public restrooms, including in K-12 schools. *See* H.B. 1521, 2023 Leg., 125th Reg. Sess. (Fla. 2023). On August 23, 2023, the Florida Board of Education voted to expand the rule from K-12 public schools, prisons, and some state colleges to private colleges and universities. *See* Fla. Admin. Code r. 6A-6.0963; 6A-14.00612. Senate Bill 1438, also signed into law on May 17, 2023, criminalizes drag shows. *See* S.B. 1438, 2023 Leg., 125th Reg. Sess. (Fla. 2023).

Finally, SB 254 not only banned medical care for transgender adolescents, but as noted above, also banned any public funding for transition-related care and restricted that care even for adults. It also gives Florida judges the power to take emergency jurisdiction over the

custody of an out-of-state child and award custody to a noncustodial parent if the child receives medical care for gender dysphoria, treating the provision of such care the same as child abuse. Fla. Stat. § 61.517(1)(c).

Taken together, these measures constitute a clear expression of governmental hostility toward transgender Floridians and establish an official public policy of disapproval of permitting transgender people to live consistently with their gender identities—to the point of making it official Florida policy that transgender identity is "false." No other state in the country has enacted as many anti-transgender measures as Florida. Nor has any other state enacted measures as extreme as some of Florida's new laws, including its unprecedented imposition of restrictions on medical care even for transgender adults.[5]

---

[5] C.A. Bridges, *What can I do if I'm a transgender person living in Florida? State erasing trans options,* Tallahassee Democrat, May 18, 2023,
https://www.tallahassee.com/story/news/politics/2023/04/25/floridas-trans-people-parents-of-trans-kids-see-options-steadily-banned/70132161007/.

This extraordinary historical context supports the district court's conclusion that SB 254 and the Board Rules are the product of purposeful discrimination.

>    c.    **The Specific Events Leading to the Bans Were Surrounded by Departures from Normal Process and Demonstrate Discriminatory Purpose**

The events leading to SB 254 and the Board Rules also strongly suggest a purpose to discriminate against transgender people. *See Arlington Heights*, 429 U.S. at 267. On March 2, 2022, the U.S. Department of Health & Human Services (HHS) issued a notice to state child welfare agencies of their obligation under federal law to provide transgender youth with nondiscriminatory access to medical care for gender dysphoria. The HHS Secretary issued a statement condemning attempts by Texas to prosecute parents who obtained medical care for transgender youth for alleged child abuse.[6]

---

[6] U.S. Dep't of Health & Human Servs., *Statement by HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth,* https://www.hhs.gov/about/news/2022/03/02/statement-hhs-secretary-xavier-becerra-reaffirming-hhs-support-and-protection-for-lgbtqi-children-and-youth.html.

In response, Florida's Executive Office of the Governor in early April 2022 directed the Department of Health and the Agency on Health Care Administration (AHCA) to adopt a policy for Florida to ban medical care for transgender minors. *Dekker,* 2023 WL 4102243, at *4 n.18 (citing *Dekker* Doc. 235-1 at 87).

On April 20, 2022, the Florida Department of Health issued guidance stating that transgender minors "should not be prescribed puberty blockers or hormone therapy," that gender "reassignment surgery should not be a treatment option for children or adolescents," and that "social gender transition should not be a treatment option for children or adolescents." *Dekker* DX 5 (*Dekker* Doc. 193-5). A news release called "into question the motives of the federal HHS" in supporting this care. *See* Fla. Dep't of Health, *Florida Department of Health Releases Guidance on Treatment of Gender Dysphoria for Children and Adolescents* (Apr 20, 2022), https://www.floridahealth.gov/newsroom/2022/04/20220420-gender-dysphoria-press-release.pr.html?aff_id=1262. Shortly thereafter, the AHCA commissioned a new report ("the GAPMS report") with the predetermined goal of opposing medical care for transgender people. As

31

the district court found after extensive trial testimony, "[t]he new GAPMS process was, from the outset, a biased effort to justify a predetermined outcome, not a fair analysis of the evidence." *Dekker*, 2023 WL 4102243, at *4.

Previously, AHCA's practice had been "to prepare a GAPMS report only when first considering a treatment, but here, apparently for the first time ever, AHCA elected to prepare another report for these already-approved treatments." *Id.* Indeed, previous AHCA GAPMS reports had already approved the use of puberty blockers and hormone therapy to treat gender dysphoria. *See id.* at *3–4 (citing *Dekker* PX 240 at 9 (*Dekker* Doc. 181-4), *Dekker* PX 243 at 1, 11, (*Dekker* Doc. 181-7)). Similarly, "AHCA ordinarily prepares reports internally, without retaining consultants, but here, AHCA retained consultants. AHCA retained only consultants known in advance for their staunch opposition to gender-affirming care." *Id.* at *4 (citing *Dekker* Tr. at 178–79 (*Dekker* Doc. 227).

A day later, on June 3, 2022, AHCA proposed eliminating Medicaid coverage for transgender medical care, reversing established policy covering such care. *Id.* at *4 (citing *Dekker* Tr. at 106–08, 129, 161, 196–97 (*Dekker* Doc. 228)). This was followed by "a well-choreographed public

hearing that was an effort not to gather facts but to support the predetermined outcome." *Id.* Less than two months later, on July 28, 2022, the Florida Department of Health and the Florida Surgeon General petitioned the Boards to prohibit medical treatment for transgender adolescents. State Surgeon General Joseph A. Ladapo, M.D., *Letter to the Florida Board of Medicine* (June 2, 2022), https://www.documentcloud.org/documents/22050967-board-letter; Marc Caputo, *DeSantis Moves to Ban Transition Care for Transgender Youths, Medicaid Recipients*, NBC News (June 2, 2022, 8:55 PM) https://www.nbcnews.com/politics/politics-news/desantis-moves-ban-transition-care-transgender-youth-medicaid-recipien-rcna31736; Pro. Staff of the Comm. on Fiscal Pol'y, Fla. S. Bill Analysis and Fiscal Impact Statement, CS/SB 254, at 17-18 (Mar. 22, 2023). Both Boards subsequently voted to adopt rules banning medical care for transgender minors, which were finalized on February 10, 2023. Fla. Boards of Medicine and Osteopathic Medicine, *Rule Hearing*: *Standards of Practice for the Treatment of Gender Dysphoria in Minors*, Fla. Admin. Code Ann. r. 64B9-9.019 and 64B15-14.014, (Feb. 10, 2023) https://www.flrules.org/Gateway/View_notice.asp?id=26833612. Based

33

on the flawed GAPMS report, legislation to ban medical care for transgender minors and to restrict it for adults was introduced less than two weeks later, on February 21, 2023, and SB 254 was signed into law on May 17, 2023.[7]

As this rapid succession of events makes plain, SB 254 and the Board Rules were driven by predetermined opposition to providing medical care for transgender people and marked by repeated departures from normal process. At each step, the goal was to effectuate a predetermined objective of restricting care, not to undertake a neutral or good faith inquiry.

### d.    Contemporaneous Statements Demonstrate that Animus Motivated the Bans

The district court's findings concerning the highly unusual nature of the GAPMS process were supplemented by contemporaneous statements of policymakers disparaging or disapproving of transgender

---

[7] SB 254 relied on the flawed GAPMS report to justify the bills' prohibitions and restrictions on access to medical care for transgender people. *See, e.g.*, H.R. Staff Final Bill Analysis, CS/CS/HB 1421, at 8 (May 22, 2023); Pro. Staff of the Comm. on Fiscal Pol'y, Fla. S. Bill Analysis and Fiscal Impact Statement, CS/SB 254, at 17-18 (Mar. 22, 2023); Pro. Staff of the Comm. on Health Pol'y, Fla. S. Bill Analysis and Fiscal Impact Statement, CS/SB 254, at 20 (Mar. 10, 2023).

people. The district court cited just a few of the many examples in the
*Dekker* and public records. The court pointed to a "fact sheet" in which
"the Florida Department of Health asserted social transitioning, which
involves no medical intervention at all, should not be a treatment option
for children or adolescents." Doc. 90 at 26 (citing *Dekker* DX 5 at 1 (*Dekker*
Doc. 193-5)).  As the district court correctly observed, "[n]othing could
have motivated this remarkable intrusion into parental prerogatives
other than opposition to transgender status itself." *Id.* The court also
referenced comments made by Representative Webster Barnaby, who
referred to transgender Floridians who spoke at a public hearing as
"'mutants living among us on Planet Earth . . . That's right I called you
demons and imps who come and parade before us and pretend that you
are part of this world.'" *Id.* at 33 n.62 (citing *Hearing on Facility
Requirements Based on Sex*, CS/HB 1521 2023 Session (Fla. Apr. 10,
2023), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8804
(time stamp 2:30:35 to 2:34:10)). Although Defendants dismiss these
statements as isolated comments, Op. Br. at 23, they were part of a
broader context of repeated statements by legislators.

35

One representative cited a fabricated story that a parent had put a six-month-old child on hormone therapy and that the toddler was "changed into a man." *Gender Clinical Interventions: Hearing on H.B. 1421 Before the H. Healthcare Regul. Subcomm.*, 2023 Leg., 125th Sess., at 1:53:53 to 1:54:09 (Fla. Mar. 22, 2023) (statement of Rep. Melony M. Bell, Member, H. Healthcare Regul. Subcomm.), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8694. Representative Randy Fine referred to medical care for transgender adolescents as an "abomination," and "child abuse." *Gender Clinical Interventions: Hearing on H.B. 1421 Before the H. Healthcare Regul. Subcomm.*, 2023 Leg., 125th Sess., at 32:57- 35:51; 2:03:54-2:03:58 (Fla. Mar. 22, 2023) (statement of Rep. Randy Fine), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8694. Another representative referred to medical care for transgender people as "gruesome" and "diabolical," and claimed that it leaves those that undergo it "disfigured" and "crippled." *An Act Relating to Treatments for Sex Reassignment: Hearing on S.B. 254 Before the Fla. H.R.*, 2023 Leg., 125th Reg. Sess., at 2:23:05-2:24:04 (Fla. Apr. 19, 2022) (statement of

Rep. Dean Black), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=886.

> **e.    Florida Had Many Less Discriminatory Alternatives Available to Advance Each of its Asserted State Interests, but Instead Elected to Enact a Total Medical Care Ban Only for Transgender Adolescents**

The district court correctly found that Florida had nondiscriminatory alternatives to achieve any legitimate governmental objectives purportedly advanced by the Bans. For example, if Florida sought to protect patients from genuine medical risks or safety issues associated with puberty blockers and hormone therapy, it could have banned those medications for all minors. The vast majority of patients who receive them are non-transgender patients with precocious puberty (puberty blockers) or conditions such as painful menstruation, amenorrhea and acne. Doc. 30-6 at 23-24. Instead, Florida banned them only when needed by transgender adolescents.

If Florida sought to ensure that individuals receive competent and appropriate care for treatment of gender dysphoria, it could have required compliance with established guidelines, which include standards for prescribing medication, ensuring that patients understand

the risks and benefits of treatment, and obtaining informed consent. Florida could have required providers to follow those standards or enforced them in the same way it enforces standards for any other type of medical care, such as through disciplinary proceedings before the relevant regulatory boards or traditional remedies for medical malpractice. Instead, Florida banned all medical treatment for gender dysphoria in transgender adolescents.

In sum, the district court did not abuse its discretion in concluding that the Bans have a discriminatory effect and were motivated in substantial part by an improper discriminatory purpose.

## B. The District Court Correctly Concluded that Defendants' Proffered Justifications for the Bans Fail Any Level of Scrutiny

The district court also correctly concluded that SB 254 and the Board Rules could survive neither intermediate nor rational basis scrutiny. Doc. 90 at 25. The court carefully considered each of the justifications Defendants advanced in support of these provisions. It found, based on substantial evidence, including the trial record in *Dekker*, that the evidence supporting Defendants' "laundry list" of justifications was so weak as to demonstrate those rationales were "largely pretextual."

Indeed, in the district court's view, the factual and logical predicate supporting each of these justifications was either nonexistent or so insubstantial as to fail even the most lenient form of constitutional review. Doc. 90 at 27.

In particular, the district court found that the treatments provided to transgender adolescents are effective and based on a well-established and accepted standard of care. *See* Doc. 90 at 7–13. The district court specifically found credible the voluminous testimony of "well-qualified doctors who have treated thousands of transgender patients" and noted that the "record includes no evidence that these treatments have caused substantial adverse clinical results in properly screened and treated patients." Doc. 90 at 12–13. The district court also found that "evidence suggesting these treatments are ineffective is nonexistent" and that while they carry risks, as any medical treatment does, the benefits of their use in appropriate cases outweigh any of the risks. *See* Doc. 90 at 11, 28.

Defendants argue that the district court failed to afford them a "presumption of validity or presumption of good faith." Op. Br. at 16. That argument lacks merit, for two reasons. First, no presumption of validity

attaches when heightened scrutiny applies, as it does here. *See, e.g., Virginia,* 515 U.S. at 533 (holding that under heightened scrutiny, the government has the burden to prove an "exceedingly persuasive" justification for the challenged law). As demonstrated above, the record supported the district court's conclusion that the Bans were enacted at least in part because of "the state's disapproval of transgender status" and for the illegitimate purpose of "[d]iscouraging individuals from pursuing their gender identities, when different from their natal sex." Doc. 90 at 25–26. Because the record established that the Bans were motivated at least in part by purposeful discrimination, the burden was on Defendants to prove an exceedingly persuasive, non-pretextual justification. *See id.* at 26 (citing *Adams,* 57 F.4th at 810).

Second, the district court readily acknowledged the deferential nature of rational basis review; it correctly observed, however, that "rational-basis review no longer means virtually no review." Doc. 90 at 18 (citing *Romer v. Evans,* 517 U.S. 620, 632 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985); *United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973)). Even under rational basis review, courts

will not "blindly accept a proffered reason [for government] action that [does] not withstand meaningful analysis." Doc. 90 at 23. A law fails rational basis review when "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979). Moreover, "even in the ordinary equal protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be attained." *Romer,* 517 U.S. at 632.

The district court afforded appropriate deference to the State of Florida's legislative judgments, but correctly concluded, based on the substantial evidence before it, that the Bans fail that basic test of rationality. The district court's findings addressed each of the major justifications that Defendants advanced or hypothesized, and correctly rejected each of them as lacking a rational, let alone substantial, connection to any legitimate governmental objective.

**1.    The    District    Court    Correctly    Rejected
Defendants' Claim that the Bans Protect Patients
from Treatments Supported by "Low Quality"
Evidence**

Defendants contend that SB 254 and the Board Rules are justified

because the evidence supporting the use of the prohibited medications for

treatment of gender dysphoria is of "low" or "very low" quality, as those

terms    are    used    in    Grading    of    Recommendations,    Assessment,

Development,  and  Evaluation  ("GRADE")  system,  a  commonly  used

methodology for assessing medical research. *See* Op. Br. at 30–31. The

district court  recognized,  however,  that  the  rationality  of  prohibiting

treatments based on GRADE scores can only be assessed in light of the

way the research supporting other medical treatments would fare based

on the use of GRADE scores.

As  Plaintiffs'  expert  witness  Kenneth  Goodman  testified,  the

GRADE system's rating of evidence simply reflects whether the research

involved randomized controlled trials (which are initially rated as "high

quality")  or  observational  studies  (which  are  initially  rated  as  "low

quality"). Doc. 58-1 at 6. Crucially, many established treatments—

including,  for  example,  many  medical  interventions  for  pediatric

cancer—are supported only or primarily by evidence that would be rated

42

as "low quality" under the GRADE system. *See id.* at 6, 9. As Dr. Goodman testified, "it is incoherent to suggest that, in the absence of 'best-grade' evidence, clinicians should provide no clinical intervention or treatment at all." *Id.* Were that the standard for all clinical guidelines, "many well-established and effective medical treatments would be barred from use." *Id.* Moreover, attempting to obtain "high-quality" evidence via randomized controlled trials would present serious ethical concerns, as it would require withholding standard-of-care medical treatment from a control group of transgender adolescents to determine whether they experience worse physical and mental health outcomes than adolescents who are able to receive treatment. *See id.* at 8. This testimony was consistent with that of other witnesses from the *Dekker* trial. *See Dekker* Tr. 67–70, 342–351, 360–361.

In addition, when compared to the quality of the research supporting the effectiveness of the banned treatments for gender dysphoria, the district court correctly found that evidence indicating that these treatments are ineffective, or that withholding medical treatment would lead to improved outcomes, is "nonexistent." Doc. 90 at 28. On this record, there was no clear error in the district court's finding that reliance

on GRADE scores "would not rationally control the decision" whether to ban medical treatment for transgender adolescents, when a similar standard is not applied to numerous other medical treatments, and when the evidence demonstrating that these treatments are unsafe or ineffective is "weaker or nonexistent." *Id.*

> ### 2. The District Court Correctly Rejected Defendants' Claim that the Bans Protect Patients from Risks

The district court also correctly found that the Bans cannot be justified, even under rational basis review, based solely on the fact that the banned treatments, like many medications, carry some risks. As the district court recognized, many if not most types of medical treatment carry risks. Doc. 90 at 32. While no medication can be shown to have zero risks, puberty delaying medication and hormone therapy are very safe and well within acceptable risk factors for approved medication for minors. Doc. 30-4 at 25–30; Doc. 30-5 at 9-11; Doc. 30-6 at 19–21, 23–25. The same medications used to treat gender dysphoria are routinely used in the treatment of other medical conditions in youth. Doc. 30-4 at 22–23; Doc. 30-6 at 20-21. Puberty blocking medication has been used for decades to treat a medical condition known as "precocious puberty." Doc.

30-4 at 22-23; Doc. 30-6 at 20–21. Hormone therapy is used to treat verified disorders of sexual development, often referred to as intersex conditions, as well as other medical conditions experienced by adolescents, including painful menstruation, amenorrhea, and serious acne. Doc. 30-6 at 23-24.

There is no rational, let alone substantial, reason to ban these medications only for use in treatment of gender dysphoria and not for treatment of other conditions. Indeed, one of the principal studies relied on by Defendants as evidence of risk concerned the use of puberty delaying medications to treat precocious puberty, yet Florida has not banned these medications when used for that purpose. *See* Doc. 90 at 31.

Further, as the district court recognized, no meaningful assessment of the rationality of banning particular treatments can be made without comparing risks with benefits. The record before the court demonstrated that there are "substantial benefits for the overwhelming majority of patients" receiving the banned treatments, and there are also "risks attendant to *not* using these treatments, including the risk—in some instances, the near certainty—of anxiety and depression and even suicidal ideation." *Id.* In sum, there was no clear error in the district

court's finding that, without more, the mere existence of some risk associated with medical treatment for gender dysphoria does not supply "a rational basis for denying patients the option to choose this treatment." Doc. 90 at 32. Indeed, given Defendants' apparent lack of concern for such risks when the same treatments are prescribed for other conditions, the record revealed this purported justification as simply a pretext for discrimination against transgender youth.

### 3. The District Court Correctly Rejected Defendants' Claim that the Bans Are Necessary to Remedy Bias in Medical Organizations

The district court also properly rejected Defendants' contention that the Bans are rationally necessary to respond to bias within medical professional organizations that have endorsed clinical guidelines supporting medical treatments for gender dysphoria in adolescents. As the district court correctly found, the banned treatments are supported by "the great weight of medical authority." *Id.* No credible evidence supported Defendants' assertion that the doctors and professional organizations that have accepted these treatments, subject to appropriate clinical guidelines, were motivated by anything other than a desire to provide safe and effective care.

46

By contrast, the record demonstrated that the process that led to the adoption of the Bans was distorted by bias and departed in numerous ways from past regulation of medical practice. For example, the GAPMS report inexplicably departed from the GRADE framework by excluding from consideration evidence deemed "low quality." Doc. 58-1 at 7. No other pediatric clinical guidelines or standards of care have been rejected by the Medical Boards for this reason, even though many of them are supported by less than "high quality" evidence. *Id.* at 9. *See also Dekker Tr.* at 349–50. In short, on the present record, Defendants' claim that the Bans are justified by bias among medical professionals is not merely irrational, it is "fanciful." Doc. 90 at 34.

> **4. The District Court Correctly Rejected Defendants' Claim that the Bans Are Necessary to Prevent Noncompliance with Standards of Care or to Conform to Standards from Other Countries**

The record also provides no support for Defendants' position that the Bans address the fear that providers will not adhere to established clinical guidelines in evaluating patients and prescribing treatment. As the district court noted, no real evidence supported Defendants' view that the prohibited treatments have been provided in Florida without appropriate involvement of mental health professionals and other

47

providers in a multidisciplinary approach to assessment and care. *Id.* at 36. Moreover, even if such fears had any basis in fact, the rational response would be to require compliance with those standards, not to ban treatment entirely. Imposing a total ban on all medical treatment for adolescents newly diagnosed with gender dysphoria does not rationally advance any claimed interest in providing quality care. Instead, it deprives the affected youth of the only medical treatments that are supported by evidence of effectiveness and exposes them to the many well-documented risks to mental and physical health associated with untreated gender dysphoria.

The district court likewise properly rejected the claim that Florida's prohibition of puberty delaying medications for transgender adolescents is rational because 98 percent or more of adolescents receiving those medications for gender dysphoria go on to receive hormone therapy when they are older. As the court correctly recognized, this fact does not establish a rational basis to believe that the standards of care are flawed and all medical interventions must therefore be banned; if anything, it means that a very high percentage of adolescents receiving puberty blockers for gender dysphoria are in fact transgender, have been

accurately diagnosed, and are receiving treatment that complies with medical standards. *See id.* at 37-38.

For similar reasons, standards adopted by various international medical organizations do not offer a rational justification for Florida's ban on medical treatment for transgender adolescents with gender dysphoria. As the district court expressly found, "[n]o country in Europe—or so far as shown by this record, anywhere in the world— entirely bans these treatments." *Id.* at 35.

On appeal, Defendants assert that the position of these countries is more aligned with the State of Florida's than Plaintiffs' because they urge "caution and care" and do not provide "treatment-on-demand." Op. Br. at 30. But Florida has not promulgated regulations requiring "caution and care." It has imposed a total ban for all adolescents, like the Plaintiffs here, who had not already started treatment before the Bans' effective dates. And Plaintiffs are not seeking "treatment-on-demand." They are seeking access to care that complies with established medical guidelines, which include thorough assessment and discussion with parents and minor patients to ensure that all persons involved understand the need for treatment along with any attendant risks. Doc. 30-4 at 13, 23–24; Doc.

30-5 at 12–20; Doc. 30-6 at 12, 14–15, 21–22, 24. As the district court correctly found, "[h]ad Florida truly joined the international consensus—making these treatments available in appropriate circumstances or in approved facilities—these plaintiffs would qualify." Doc. 90 at 35-36. Instead, they are entirely barred from receiving medical treatment for their gender dysphoria.

### 5. The District Court Correctly Rejected Defendants' Claim that the Bans Are Necessary Because the Use of the Relevant Medications to Treat Transgender Patients is Off-Label

The district court also correctly concluded that there is no rational justification for the Bans based on the fact that the FDA has not specifically approved the use of the prohibited medications for treatment of gender dysphoria, and their use for this purpose is currently an off-label use. "Off-label" refers to use of medication that has been approved by the FDA, but not for all conditions for which it may be effective. *See* Am. Acad. Pediatrics Comm. Drugs, *Off-Label Use of Drugs in Children*, 133 Pediatrics 563–67 (2014). Off-label use of medications for children is common and often necessary, because an "overwhelming number of [FDA-approved] drugs" have no FDA-approved instructions for use in pediatric patients. *See id.*

The American Academy of Pediatrics specifically approves the off-label use of drugs:

> The purpose of off-label use is to benefit the individual patient. Practitioners use their professional judgment to determine these uses. As such, the term "off-label" does not imply an improper, illegal, contraindicated, or investigational use. Therapeutic decision-making must always rely on the best available evidence and the importance of the benefit for the individual patient.

*Id.* Many established medical treatments involve off-label uses of FDA-approved medications. Doc. 30-4 at 23; *Dekker* Tr. (*Dekker* Doc. 226) at 182–84; *Dekker* Tr. (*Dekker* Doc. 227) at 120–23. There is no rational or legitimate reason, much less an important one, to adopt a different rule for medications used to treat gender dysphoria in transgender patients.

## II. THE OTHER PRELIMINARY INJUNCTION FACTORS OVERWHELMINGLY SUPPORT THE DISTRICT COURT'S INJUNCTION

The district court correctly concluded that Plaintiffs would suffer irreparable harm in the absence of a preliminary injunction. Specifically, the court found that the adolescent Plaintiffs would suffer "the unwanted and irreversible onset and progression of puberty in their natal sex—if they do not promptly begin treatment with GnRH agonists." See Doc. 90 at 39-40. Defendants offer no substantive argument that this conclusion

51

was erroneous, but instead complain that they did not yet have access to Plaintiffs' private medical records at the time the preliminary injunction issued because the necessary protective order had not yet been entered. Op. Br. at 32.

The record before the district court included ample evidence of harm in addition to the medical records. This record was more than sufficient to demonstrate that each adolescent Plaintiff will suffer severe and irreparable harm to their physical and mental health if the Bans prevent them from receiving puberty blockers. The record included declarations from the Parent Plaintiffs detailing their children's history of gender dysphoria, the diagnoses and recommendations of their treating medical providers, the imminent need for them to receive treatment at the onset of puberty, and the severe and irreparable harm that their children would suffer if unable to receive timely medical treatment for their gender dysphoria. *See* Docs. 30-1, 30-2, 30-3. For example, Plaintiff Linda Loe testified that her daughter Lisa's doctor has determined that she needs puberty blocking medications, but her endocrinologist could no longer treat her in Florida because the Bans

52

prohibit him from doing so. Doc 30-2 at 4. Similar evidence was presented for each of the adolescent Plaintiffs seeking an injunction.

The record before the district court also included extensive testimony from experts in the medical treatment of gender dysphoria, who stated that in the absence of timely medical treatment, adolescents with gender dysphoria will suffer harms that are serious, irreparable, and potentially life-threatening. *See* Doc. 30-4 at 14; Doc. 30-5 at 10; Doc. 30-6 at 10, 19, 22–23, 24–28.

Denial of medically necessary care constitutes immediate and irreparable harm warranting a preliminary injunction. *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483–84 (1986) (finding denial of benefits caused irreparable injury by exposing plaintiffs to the risk of "severe medical setback[s]"). The district court's *in camera* review of plaintiffs' medical records confirmed and corroborated the substantial evidence of harm that Plaintiffs had already submitted, documenting their diagnoses and their imminent need for treatment. Defendants offer no argument that anything in those records invalidates the district court's finding of irreparable harm.

The district court also did not abuse its discretion in finding that the remaining preliminary injunction factors favored granting interim relief to Plaintiffs. In cases involving allegedly unconstitutional government action, "the third and fourth requirements [for an injunction]—'damage to the opposing party' and 'the public interest'—can be consolidated." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (internal citations omitted). With respect to the balance of harms, the district court correctly found that "[t]he treatment will affect the patients themselves, nobody else, and will cause the defendants no harm." Doc. 90 at 40. Defendants contend that the district court failed to give enough weight to Florida's interest in enforcing its laws, but "neither the government nor the public has any legitimate interest in enforcing an unconstitutional [law]." *Otto*, 981 F.3d at 870. As the district court correctly observed, "[a]dherence to the Constitution is always in the public interest." Doc. 90 at 40.

In sum, all of the preliminary injunction factors were satisfied.

## CONCLUSION

The district court's order granting a preliminary injunction should be affirmed.

Respectfully submitted,

_s/Thomas E. Redburn. Jr._

Christopher F. Stoll
Kelly Jo Popkin
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street
Suite 370
San Francisco, CA 94102
(415) 365-1320

Simone Chris
Chelsea Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

Chris Erchull
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont
Suite 950
Boston, MA 02108
(617) 426-1350

Thomas E. Redburn, Jr.
Maya Ginsburg
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700

Sarah Warbelow
Cynthia Cheng-Wun Weaver
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180

*Counsel for Plaintiffs-Appellees*

55

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,330 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Century Schoolbook size 14-point font with Microsoft Word.

Date: November 6, 2023

*s/ Thomas E. Redburn, Jr.*
Thomas E. Redburn, Jr.
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_s/ Thomas E. Redburn, Jr._
Thomas E. Redburn, Jr.
_Counsel for Plaintiffs-Appellees_
